The V. L. SMITHERS MANUFACTURING COMPANY, Plaintiff,

v.

William P. O'BRIEN and William J. O'Malley, d.b.a. Illinois Wholesale Florist, Defendants.

Civ. A. No. P-2492.

United States District Court
S. D. Illinois, N. D.

March 18, 1964.

Richey, McNenny & Farrington, Cleveland, Ohio, Sours, Newell & Nicol, Peoria, Ill., of counsel, for plaintiff.

Jackson P. Newlin, Leiter, Newlin, Fraser, Parkhurst & McCord, Peoria, Ill., Hofgren, Brady, Wegner, Allen & Stellman, Chicago, Ill., for defendants.

MERCER, Chief Judge.

Plaintiff, The V. L. Smithers Mfg. Co., is the owner by assignment of United States Letters Patent No. 2,753,277, issued July 3, 1956, to Vernon L. Smithers relating to the manufacture of an absorbent material for floral arrangements. Plaintiff is engaged in the manufacture and sale of the patented product, namely, a hydrophilic floral foam, which it markets under the trade name "Oasis".

Defendants are wholesale florists, doing business in the State of Illinois. They sell the accused product which is manufactured by American Metaseal of Massachusetts, Inc., and is marketed under the trade names of "Aquafoam" and "Quickee."

Defendants pleaded invalidity of the patent and non-infringement thereof as defenses to the suit. After a trial of the cause, and the submission of briefs by the respective parties, the case is before the court upon the issues joined by defendants' answer.

The patent and the issues are best understood by a brief history of the prior art. Floral arrangement has two basic needs for optimum results. The first is a material which will hold the stems of the cut flowers in place and preserve the arrangement thereof. Secondly, for optimum utility, such material needs to be quickly water absorbent and water retentive. Sponge, moss and a number of other substances were used from time to time for such arrangements, but without completely satisfactory results. Some of the substances known and used by the art did not readily support cut flowers

and none had the water retention qualities which were desirable.

Foam material made from urea-formaldehyde and phenolic condensation resin were known to the art long before the Smithers patent.[1] Such foam is very light in weight and contains within a given mass thereof a great number of sealed bubbles, or voids. It is hydrophobic (water repellant) by nature. As the evidence adduced in this case reveals, the U. S. Rubber Company manufactured such a foam under the name "Flotofoam" which was used extensively during World War II to float military equipment in water. Thus, the foam itself lacked one of the necessary qualities for use in the arrangement of cut flowers, namely, it was not readily saturable. On the other hand, such foam is frangible by nature, even when saturation is achieved, and will readily admit the stems of cut flowers to be forced into the mass thereof without breaking the foam and will readily support even heavy cut flowers.

One of the first uses of urea-formaldehyde foams for flower arrangements was the "Sno-Pak" product manufactured and marketed by U. S. Rubber Company, among others. Saturation of the Sno-Pak product was achieved by placing the mass of the foam under water where it was crushed by a lever-plate mechanism, thus opening the walls of some of the closed voids in the foam and admitting water thereto.

That, in brief summary, is the state of the art prior to the Smithers' patent.

### THE PATENT IN SUIT

Basically, what Mr. Smithers did was to combine urea-formaldehyde foam with a wetting agent [2] to make the foam readily saturable (hydrophilic) with the result that a given mass of the foam, treated in the manner taught by the patent, would readily absorb and retain many times its weight in water. When thus saturated, stems of cut flowers can be inserted into the saturated mass of foam without distortion of the mass so that they remain supported in place for the life of an arrangement and there is no drainage or loss of water from the mass of foam.

Claim 1 of the patent in suit is illustrative of the three claims alleged to be infringed. It claims: "As a new article of manufacture a water retentive mass of a foamed synthetic material selected from the group consisting of urea-formaldehyde and a phenolic condensation resin, suitable for supporting the stems of cut flowers, said mass being frangible when saturated with water so as to allow penetration of the stems of flowers without distortion of the mass and having a multiplicity of small bubble-like voids, and a layer of a wetting agent on the ex-

1. Phenolic resin foams are a generic group of related compounds having as base components urea-formaldehyde and a phenolic condensation resin. For purposes of this opinion, the foam used by plaintiff and that used in the accused product are treated as identical materials, ignoring possible variations in the precise basic composition thereof.

2. "Wetting Agent" is a generic term, descriptive of a large number of chemical substances which have the property of causing water to penetrate water repellant materials. Because the molecules of water strongly attract each other, its surface tension is extremely high. When water is placed on a water repellant material which it has the incapacity to wet readily, this attraction of the molecules for each other causes a drop of water to assume a spherical shape as the outermost molecules are drawn inwardly toward the molecules in the center of the drop. Wetting agents have a two-part molecule. One part is attracted to water, while the other part is repelled by water. When such an agent is placed in water, the molecules of the agent tend to concentrate on the surface of the water with the repelled part at the surface. This film of hydrophobic molecules at the surface interferes with the cohesive attraction of the water molecules for each other, greatly diminishing the surface tension. Since the hydrophobic part of the agent is itself attracted to hydrophobic materials, when water containing a wetting agent is placed on a water-repellant substance, the attraction of the wetting agent to the molecules of the substance causes the water to flow into and wet the substance.

terior of the mass adapted to carry water into the interior of the mass."

Claim 2 is identical to Claim 1 except that it claims, in the last clause thereof, "A dried layer of a liquid wetting agent on the exterior of the mass adapted to carry water into the interior of the mass." Claim 3 is likewise identical to Claim 1 except that it claims in the last clause thereof, "A dried layer of a liquid wetting agent on the exterior of the mass adapted to carry water into the interior of the mass and into any closed voids." [3]

The product, Oasis, manufactured under the Smithers patent, is manufactured by foaming large quantities of material which, when set and dried, produce large blocks of the foam material. These are then cut into brick shaped blocks of the desired size, upon all exterior surfaces of which a wetting agent is applied and permitted to dry. The blocks are then sold to the floral industry in such prepared state. As needed, the florist simply places the block in a container of water wherein it becomes saturated in a brief period of time.[4]

## THE ACCUSED MATERIAL

"Aquafoam" or "Quickee", is also manufactured by combining urea-formaldehyde foam with a wetting agent to achieve the same result as plaintiff's Oasis.

The accused product is made from a phenolic resin foam of the same character as that used in Oasis. After the foam has set and dried, it is cut in blocks or masses of the desired size. These blocks or masses are placed upon a machine which injects one surface of the block with a large number of needles which penetrate the mass to within a short distance from the opposite surface thereof. After the points of the needles have penetrated within the interior of the mass, a liquid wetting agent is fed through the needles into the mass. The machine used is so designed that the feed of wetting agent through the needles ceases before the needles are withdrawn from the block of foam. The resulting product is a mass of foam having a large number of holes or openings upon one exterior face thereof with the wetting agent disposed therein.

When used, the mass of foam is placed in water with the holes down. The result is a product which is readily saturable with water and which tends to reach saturation more quickly than does Oasis.[5]

## INFRINGEMENT

■ Upon the issue of infringement, it is axiomatic that the monopoly of a patent is limited by the claims thereof.

The elements comprising the claims of this patent, namely, urea-formaldehyde, phenolic resin foam and the employment of wetting agents to achieve wetting are both old in the art and, thus, not the subect of monopoly. Thus, using claim 1 as an example, the critical language is the last clause describing the particular combination of such known elements to achieve novelty, to-wit, a combination of a foam of the type thereinbefore described with "a layer of a wetting agent on the exterior of the mass adapted to carry water into the interior of the mass."

The accused product does accomplish the same result as plaintiff's patented product by the use of the same combination of elements. In view of the limitation upon the patent claims to a combination having a layer of wetting agent upon the exterior of the mass sufficient to carry water into the interior of the mass, the issue upon infringement is the question whether the accused product has a like layer of wetting agent on the exterior of the mass.

3. Claims 4 and 5 of the patent are dependent claims, defining the limits of acidity of foams manufactured as described in claims 1 to 3.

4. A second embodiment of the claimed invention is the use of the foam material in shredded form.

5. The accused product is manufactured by a process described in U.S. Letters Patent No. 3,049,444, issued August 14, 1962, to Albert M. Palombo, the President of American Metaseal.

Each party called expert witnesses who reached diametrically opposed conclusions upon the question whether active wetting agent was present on the exterior of the accused product.[6]

Mr. Wetherill, for plaintiff, concluded that there was wetting agent upon the exterior of the accused product from mechanical tests which he had performed.

Dr. Colburn, for the defendant, conducted chemical analyses of the accused product and certain mechanical tests which led to his conclusion that there was no wetting agent, or only an insignificant trace of active wetting agent, upon any of the external surfaces of the accused Aquafoam. He found the wetting agent contained in the product concentrated in the interior of the mass.

A series of mechanical tests performed by Dr. Colburn are enlightening. A block of the accused foam placed in water with the holes down became completely saturated within one hour. By way of contrast, blocks floated upon water with the holes up failed to absorb water and remained floating at the end of twenty-four hours. He removed a slice one-half inch thick from the perforated side of an Aquafoam block, thus exposing a surface having substantial wetting agent upon it, which he covered with an untreated piece of foam, with the joint sealed to prevent the entry of water therethrough. He placed that composite in water, with the grafted untreated surface down. The block continued to float at the end of twenty-four hours with no significant penetration of water thereinto. To one perforated blank block of foam, Dr. Colburn joined a slice 1/4 inch thick from the perforated side of a block of commercial Aquafoam. To another, he joined a 1/8 inch thick slice from the perforated side of a treated Aquafoam block. When these were floated upon water, saturation of only the treated section was achieved. No significant penetration of the untreated foam was noted. To an unperforated, untreated block of foam, Dr. Colburn affixed a 1/8 inch thick slice from the exterior of an Oasis block, with the exterior of the Oasis block becoming one exterior surface of the composite. When placed upon water, with the Oasis side down, approximately one-half of the composite block became saturated and submerged within thirty minutes. As a final test, Dr. Colburn cut a 1/4 inch slice from the perforated face of a commercial Aquafoam block. To that surface, he attached a 1/4 inch slice from an untreated block which had been perforated with the same hole pattern as the commercial Aquafoam. The composite so formed, when placed in water with the holes down, became saturated and sank within thirty minutes.

I find the Colburn tests extremely significant. They lead to the conclusion that there is no significant amount of active wetting agent upon any of the exterior dimensions of the accused foam. Rather, the accused device depends for its success upon water entering through the many perforations to contact the wetting agent within the mass, after which water is quickly drawn into the interior of the mass of foam.

In fact, Dr. Colburn's conclusions are not seriously contradicted by the testimony of Mr. Wetherill. The latter testified that an analysis of the surface of accused product was inconclusive with respect to the question whether active wetting agent was, or was not, present. He did testify that he floated a block of the accused foam upon water with the holes up and that that block became saturated and sank. There is, however, no dispute in the evidence that foams vary from batch to batch and that some open cells are formed. In weighing all of the evidence, it is illogical to assume that active wetting agent must have been pres-

6. A small quantity of a wetting agent is an ingredient of the foam itself. Although that wetting agent remains within the cells of the mass of foam, it does not remain as an active wetting agent because of a reaction to the foaming process. Thus, the exterior of the blank foam contains chemically detectable traces of residue of the agent used in the foaming process.

ent on the outer surface of the latter block to account for its saturation. As Mr. Wetherill admitted, if there were an opening in the exterior of the mass which would admit water into the interior of the mass and into contact with the wetting agent therein, the mass would then wet rapidly.[7]

I find from all of the evidence that there is no significant amount of wetting agent upon any exterior surface of the accused product. It is certain that there is absent a "layer" of wetting agent, and no amount of wetting agent on any exterior face of the material adequate "to carry water into the interior of the mass".

Indeed, plaintiff virtually concedes that finding by its assertion that the circumference of each of the holes in the accused product is a part of the exterior of the mass. It argues that the wetting agent within the mass of the accused product would be principally concentrated upon the surfaces within the many holes, and that perforation of the mass merely increases the exterior surface thereof.

I reject the argument. The claims speak of "exterior" and it is clear from the teaching of the patent that that term was used in its ordinary sense, i. e., as descriptive of the outer faces of the mass. One cannot read the specifications without concluding that the inventor attached no special or unusual meaning to that word. The specifications state, inter alia: "It has been discovered that if the foam after being produced in the manner described, is given an exterior coating of a wetting agent, the absorptive properties of the foam are increased to a degree which is astonishing.

"For this purpose a block of foam * * * is sprayed with a wetting agent so that the agent dries in a thin layer at the surface of the block. The layer of wetting agent does not penetrate appreciably into the block but remains as a solid coating over the exterior of the

block until the block is immersed in water." Continuing, it states:

"The fact that the wetting agent is concentrated on the surface of the block and is carried into the block by the water, causes the concentration of the wetting agent to progressively diminish as the water is absorbed by the block. This action is very desirable because the concentrated wetting agent is not beneficial to the flowers, but as it is only in a very dilute solution in the interior of the block, any deleterious effects of the wetting agent are nullified.

"An important advantage in coating the exterior of the foam with the wetting agent is that the dried layer of wetting agent will act as a binder over the exposed surfaces of the block, and this will prevent the objectionable dusting off of fine particles of the material in handling."

I hold that the surfaces of the perforations within the body of the accused product are not a part "of the exterior of the mass" within the meaning of the claims of the patent in suit.

■ Plaintiff is estopped to rely upon the doctrine of equivalents to prove infringement. The original Smithers application contained a claim as follows:

"As an article of manufacture, a synthetic organic foam and a wetting agent carried in the cells thereof." The application was rejected by the Examiner on the prior art and, also, because the claim was broad enough to cover synthetic rubber and all other plastic foams.

In response to that rejection, the specifications were amended to teach the application of the wetting agent to the exterior of the foam. The original claims were cancelled and new claims were drawn to include a specification of the group of foams included within the teaching of the patent, in combination with a layer of wetting agent applied to the exterior of the mass. Having so

7. Wetherill's report of his float test indicates that the block tilted to one side before it became saturated and sank, indicative of the fact that wetting began in one area of the block, as distinguished from uniform wetting over the whole of a treated surface.

limited his claims to overcome the rejection of this application, plaintiff is estopped to claim a monopoly upon the use of wetting agent within the mass by invoking the doctrine of equivalents. Exhibit Supply Co. v. Ace Patents Corp., 315 U.S. 126, 62 S.Ct. 513, 86 L.Ed. 736; Taylor-Reed Corp. v. Mennen Food Products, 7 Cir., 324 F.2d 108; Bauer v. Yetter Mfg. Co., S.D.Ill., 205 F.Supp. 904, aff'd 7 Cir., 315 F.2d 377.

■ I find and conclude that the accused product does not infringe the claims of the patent in suit. Thus, there is no necessity to consider the issue of validity. The court's findings of fact are included in the foregoing memorandum.

### CONCLUSIONS OF LAW

1. The court has jurisdiction of the parties and subject matter in the cause of action.

■ 2. Words used in the claims of a patent must be given their ordinary and accustomed meaning unless it appears from the patent application and the specifications that the inventor attached some different meaning thereto. Cf., Apex Electrical Mfg. Co. v. Altorfer Bros. Co., 7 Cir., 238 F.2d 867, 873.

■ 3. To prove a patent infringed, the complaining party must prove not only that the accused product accomplishes the same result, but, also, that the accused product achieves that result by substantial piracy of the invention claimed or by an equivalent means. Zysset v. Popeil Brothers, Inc., 7 Cir., 276 F.2d 354, 357; Hunt v. Armour & Co., 7 Cir., 185 F.2d 722, 728. The function of an invention is not patentable. Variations of form to achieve the same result may be disregarded upon the question of infringement, but an accused product does not infringe a patent unless the substance of the invention claimed is employed by the alleged infringer. Westinghouse v. Boyden Power-Brake Co., 170 U.S. 537, 569, 18 S.Ct. 707, 42 L.Ed. 1136.

■ 4. Before infringement can be found, the evidence must reveal that the placement of the elements of the accused material correspond to the claim of "a layer of a wetting agent on the exterior of the mass adapted to carry water into the interior of the mass", or that the elements of the accused material are so arranged as to require application of the doctrine of equivalence. Independent Pneumatic Tool Co. v. Chicago Pneumatic Tool Co., 7 Cir., 194 F.2d 945, 947.

■ 5. The doctrine of equivalence cannot be invoked by a patentee to recapture a monopoly which he disclaimed in order to obtain the grant of his patent. Exhibit Supply Co. v. Ace Patents Corp., 315 U.S. 126, 136–137, 62 S.Ct. 513, 86 L.Ed. 736. Taylor-Reed Corp. v. Mennen Food Products, 7 Cir., 324 F. 2d 108. Bauer v. Yetter Mfg. Co., D.C. Ill., 205 F.Supp. 904, 906, 909, aff'd 7 Cir., 315 F.2d 377.

6. Defendants are entitled to judgment dismissing plaintiff's suit and to their costs.

Judgment is ordered in accordance with the findings and conclusions hereinabove expressed.