Victor M. LANGSETT, Trustee, and
Kesko Products, Inc., Plaintiffs,

v.

MARMET CORPORATION, Defendant.

Civ. A. No. 3449.

United States District Court
W. D. Wisconsin.

June 5, 1964.

Herbert Terwilliger, of Genrich, Terwilliger, Wakeen, Piehler & Conway, Wausau, Wis., Bryan Medlock, of Arnold & Roylance, Houston, Tex. for plaintiffs.

John W. Kelley, Wausau, Wis., John W. Hofeldt, Haight, Simmons & Hofeldt, Chicago, Ill., for defendant.

RABINOVITZ, District Judge.

This is a patent infringement action. Victor M. Langsett, a resident of Illinois, is trustee of the Kessler patent. Kesko Products, Inc., is the exclusive licensee of the Kessler patent. Kesko is an Indiana corporation. Marmet Corporation is a Wisconsin corporation, having its principal place of business in Wausau, Wisconsin. Letters Patent, Number 2,-654,920, were issued to the late Ward P. Kessler on October 13, 1953.

Defendant denied infringement, and alleged that the patent in suit is invalid because the patent was anticipated by the prior art; that it was obvious in light of the prior art; and that it was on sale more than one year prior to the date of the application for the patent.

This case was tried the week of October 15, 1962, in this District before Judge Patrick T. Stone, who died prior to rendering his decision. The parties agreed that judgment should be made upon further briefs, the transcript, exhibits and oral arguments. A full day of oral arguments was had on April 21, 1964, whereat this Court had the benefit of a full explanation of the patent in suit and the accused device.

The Kessler patent is for an "Insulated Metal Window Closure". The problem to which both Kessler and Marmet have directed their efforts is known as "through-metal conductivity". The use of metal window frames may result in moisture or condensation forming on the inside of the window because of the rapid or efficient heat transfer characteristics of metal.

Plaintiffs and defendant both claim this problem has been solved by use of an insulating medium to separate the window frame into exterior and interior metal channels. Dispute arose as to the duration of this problem. Plaintiffs maintain the problem is of long duration, dating back to the Crystal Palace erected in the 1850s in England. Defendant maintains the problem is one of limited scope and one which did not come into commercial significance until after World War Two. After the War, this country's expanded aluminum facilities found new use for their capacity in civilian lines. Increased knowledge of metal fabrication is factor. Defendant further maintains

the problem is limited to places having exceptionally high humidity problems, such as indoor swimming pools.

This Court believes that the matter of validity may be disposed of on one of several grounds. However, I believe that the interests of justice and efficient administration of the rights of litigants require a complete disposal of the case. In other words, all points will be discussed. Halstead v. Globe Hoist Co., 141 U.S.P.Q. 465, 231 F.Supp. 1012 (D.C.N.D.Cal.S.Div.1964). A court has the power to adjudge a patent, which it has found not to have been infringed, invalid. Lockwood v. Langendorf United Bakers, Inc., 324 F.2d 82 (9th Cir. 1963). With the public also a party to patent litigation, a full consideration should be in order. This should be the approved practice. Philip and K & J Trading Corp. et al. v. Wildman Jacquard Co., 225 F.Supp. 955 (D.C. E.D.Pa.1963). Such a practice was employed by the District Court for the Eastern District of Wisconsin in Miller v. Zarharias, et al., 72 F.Supp. 29 (E.D. Wis.1947), wherein the Court said: "In the event it should be determined by a reviewing court either that the amendment should not have been allowed, or that the plaintiff was not estopped in this action by reason of the provisions of his license agreement, I should make known my views as to the validity of the claims of the patents here in issue." In accord: W. F. and John Barnes Co. et al. v. International Harvester Co. et al., 51 F.Supp. 254 (N.D.Ill.E.D.1943) and Barry, et al. v. General Tire & Rubber Co., et al., 31 F.Supp. 879 (N.D.Ill.E.D. 1940).

## PRESUMPTION OF VALIDITY OF PATENT IN SUIT

The granting of a patent raises a presumption as to the validity of said patent. 35 U.S.C.A. § 282. However, such presumption is not conclusive; it may be rebutted by demonstrating invalidity by convincing evidence of error.

Hobbs v. Wisconsin Power & Light Co., 250 F.2d 100 (7th Cir. 1957). The Patent Office in the instant case did not cite what this Court finds to be pertinent prior art. Specifically, Pierson, Coulson and Marsh, Jr. were not cited. The presumption of validity does not exist as against a showing that the prior art was not cited by the Patent Office. "(T)here is every indication, contrary to appellant's statement, that the prior art was not before the Patent Office at the time it passed on the patent here in issue." Hobbs v. Wisconsin Power & Light Co., supra.

Kesko cites Elgen Mfg. Corp. v. Grant Wilson, Inc., 285 F.2d 476 (7th Cir. 1961). There the Patent Office had not cited certain prior art, which was in the same class and subclass as the patent in suit. The court there said that it "concluded the examiner reviewed these patents and discarded them." Further, the court determined such prior art did not "meet the invention singly," that it was not analogous art.

In AR, Inc. v. Electro-Voice, Inc., 311 F.2d 508 (7th Cir. 1962), it is stated, " * * * there is no presumption that a patent is valid as embodying an invention over pertinent prior art not cited or considered by the Patent Office." The court distinguished the Elgen case on the ground that the prior art in Elgen would not suggest to anyone skilled in the field how to combine the prior art and obtain the result as shown in the patent in suit. The posture of the case at bar is aptly described by Ar, Inc., "The Olson patent in and of itself disclosed both combination and the functional relationship of Villchur. There can be no presumption that the examiner reviewed and discarded it. It is more likely that he missed it."

This Court is satisfied that the patent examiner failed to consider relevant prior art. Further, as appears below, the examiner failed to understand the significance of one pertinent example of prior art before him.

Witness Clarence T. Fishleigh* testified at the trial for the defendant as follows: "Well, there is no possible question in my mind that the patents cited by defendant in this litigation are far closer to the—and far more pertinent to the question for the validity of the Kessler patent than were those cited by the file wrapper—or by the Patent Office and appearing in the file wrapper."

"In fact, I would say that, in the many years that I have worked with patents and patent litigation, I can't recall of a case where there was such a striking difference between the pertinency of the prior art cited by defendant and that which was considered by the Patent Office."

The Gustafsson patent was cited by the Patent Office, but it missed the pertinency of the patent. Had none of the relevant patents been cited by the Patent Office, possibly less weight would be given to the failure to cite the prior art. Briggs v. M & J Diesel Locomotive Filter Corp., 228 F.Supp. 26 (N.D.Ill.E.D. 1964). However, because the prior art not cited is so pertinent to the validity of the Kessler patent, and because the patent examiner failed to recognize the pertinency of Gustafsson, this Court concludes that the statutory presumption has been completely destroyed.

■■■ Further, the presumption of validity is not as strong where the defendant has followed the prior art rather than the patent in suit. Hazeltine Research, Inc., v. Admiral Corp., 87 F.Supp. 72 (N.E.Ill.E.D.1949).

## PATENT IN SUIT IS ANTICIPATED

■■■ The method of analysis in determining the validity of a patent in suit

is well stated in Armour & Co. v. Wilson & Co. Inc., 274 F.2d 143 (7th Cir. 1960). There the court broke down the issue into its component parts. "[W]hat the prior art was and what the patentee did to improve upon it, and then, whether what the patentee did is properly to be classified as an invention." The court determines what the prior art was, what improvements, if any, have been made in the prior art—has anything new been taught? If there is no improvement, the device is anticipated under section 102, of 35 U.S.C.A.

If the court finds improvement over the prior art, then the matter of obviousness must be determined, within the meaning of 35 U.S.C.A. § 103.

The prior art is replete with references which teach the principles employed by Kessler.

The Pierson patent number 697,746 (1902), not cited by the Patent Office, teaches the use of a rigid wood member contained within metal channels. Pierson states at Col. 1, lines 36–38, " * * * as the wood being a non-conductor is not susceptible to change with heat and cold * * * ". Pierson patented a sash bar for greenhouses, the purpose of which was to reduce the size of the bars and reduce maintenance costs. The figures accompanying his patent clearly show the glass resting on the wood, secured inwardly and outwardly by metal strips or channels.

The Coulson patent, number 834,890 (1906), not cited by the Patent Office, teaches the use of double glazed panels for insulation purposes, the modern day version of "Thermopane" windows. Coulson patented corner posts for holding the glass panes. He used a wooden member to hold the glass panes.

---

* Fishleigh is an expert patent witness. He is a consulting engineer, registered as a professional engineer in the States of Illinois, Michigan, Ohio and New York. He is a member of the National Society of Professional Engineers; the Illinois and Ohio Societies of Professional Engineers; the American Society of Mechanical Engineers; the Engineering Society of Detroit; and the Western Society of Engineers. He has "studied hundreds, if not thousands of patents". He is also an attorney at law, admitted to practice in Illinois and Michigan. Fishleigh, among other cases, was the plaintiff's expert in Briggs v. M & J Diesel Locomotive Filter Corp., 228 F.Supp. 26 (M.D.Ill.E.D. 1964).

On either side of the wood there is attached metallic face plates which are the same shape as the rigid wooden post. A thermal-break is present; although not so stated in the specifications, it does appear in the drawings.

The Marsh, Jr. patent, number 2,009,-142 (1935), not cited by the Patent Office, was for refrigerated display cases. He states, "More particularly this invention relates to means for preventing condensation or frost from forming on the windows of display cases." Col. 1, lines 5–7. His invention was for the design of airtight compartments formed by glass panes and the frame. There is a gaseous substance filling the spaces between the panes of glass. Marsh preferred ashwood as his insulator. The glass panes fit into rubber stripping. The inner and outer metallic frames secure the glass in the rubber by compressing it. The metallic channels are screwed to the wooden insulator. Marsh states, "The form shown in Figs. 1 to 5, is preferred to the form shown in Fig. 6 because the insulating liner 34 prevents the conduction of heat or cold through the window frame. Otherwise a frosting of the edges of the outer pane of glass might take place." Col. 4, lines 9–14. The preferred form in March clearly shows a complete separation of the inner and outer metallic channels by means of a wooden insulator, "preferably ashwood", in the words of Marsh, Jr.

The Owen patent, number 2,125,397 (1938), not cited by the Patent Office, employs the thermal-break in his patent for double window construction for use in railroad cars. He states in the specifications that: "A further and very important object of the invention is the provision of securing means of the character specified which will act as insulating means between the 2 frame members and prevent the member on the inner side of the window frame from becoming chilled from the member whose flange lies on the outer side of the window. Due to this expedient, the insulating value of the unit as a whole is materially increased, since a metal mounting for a double glazed window offsets to a considerable degree the insulating effect due to the double panes of construction." Col. 1, lines 22–34.

Continuing, Owen teaches: "The material 11 is preferably of organic composition having good heat insulating capacity, so that in addition to its functions as a bond securing the frame members together without the use of screws or bolts, it serves to cut down any heat transmission between the members 6 and 7, thus giving the unit increased efficiency as an insulator; this being particularly important when the unit is mounted in a metal wall, as the side of a car." Col. 2, lines 14–23.

The Verhagon patent, number 2,570,-169 (1951), not cited by the Patent Office, patented a means of sash construction for use in air-conditioned vehicles, such as railway cars, buses and airplanes. The problem Verhagon sought to solve is stated by the inventor, "In a sash of this type the temperature at one side of the sash is frequently much higher or lower than the temperature at the other side. The dead air space which is present between the panes serves to insulate the sash throughout the area of such space but in those double glass constructions which have heretofore been proposed, the conductive character of the surrounding rails, even when the rails have been made in laterally separated sections, has in large measure offset the advantages derived by such insulation, due primarily to the lack of insulation at the points of connection between the sections." Col. 1, lines 5–24. Keeping the inner and outer metal rails in a separated but equally spaced relationship [something Kessler also speaks about in his patent] are "non-metallic clamping blocks used in securing together the laterally separated sections of the rails." Col. 1, lines 44–48.

The Pollman patent, number 2,612,-097 (1952), not cited by the Patent Office, teaches as one of the objectives of his invention, " * * * to provide a window structure of metallic construction so arranged that there is no direct

metallic path of heat conduction between the path outside and the inside of the window, this path being broken by insulating barriers so as to eliminate direct contact between the outside metal and inside metal and thereby prevent one of the objections to the use of metallic window structures, namely their being too cold in winter and too hot in summer and wasteful either of heat in winter or of air conditioning refrigeration in summer." Col. 1, lines 10–21.

The Toth patent, number 2,711,232 (1955), not cited by the Patent Office, while not directly analogous, nevertheless states the problem and one possible solution, albeit not as effective as Kessler or Marmet. "Another object of the invention is to provide sash and frame construction in which free passage of heat from the inside to the outside of the window and sash or vice versa is prevented. This is accomplished by making one side of the frame or of the sash of a material having heat insulating qualities, such for example, as plastic, or if both sides of the frame and sash are made of metal, by providing an insulating layer between the sides which will prevent free heat transfer. Free heat transfer between the inside and outside portions of metal frames and sash has been a serious objection to the use of metal windows because under certain relative conditions of temperature and humidity between inside and outside condensation may be caused on the inside which may injure the interior finish of the room or be otherwise objectionable." Cols. 1–2, lines 71–72; 1–14. Toth used a soft flexible insulating material. Screws were employed to secure the frames. Thus, a complete thermal-break is not achieved.

The Gustafsson patent, number 2,-174,441 (1939), cited by the Patent Office, patented a sash bar comprising inner and outer metallic members secured to a rigid wooden or other screw retaining material. He does not discuss through-metal conductivity for in fact there is metal to metal contact in respect to the horizontal sash members. How-ever, the vertical sash member does have a thermal-break. The outer metallic frame is secured to the wooden frame by means of interlocking or interengaging edges. The Kessler means of securing the metallic channels includes such a method—the metallic channels having inturned legs which engage channels on the plywood insulating member.

What is difficult to understand is how the Patent Office failed to specifically raise the question of anticipation shown by the vertical member. Gustafsson was correctly distinguished by Kessler, when the patent examiner cited Gustafsson, by showing that the entire Gustafsson structure as a whole did not employ a thermal-break. The patent examiner did not ask why only the vertical member could be used as the entire window frame.

Additional examples of the prior art are a part of the record. What has been considered, this Court believes, is sufficient to demonstrate the extent to which Kessler is anticipated. With the prior art in mind, what has Kessler taught that is new; what has he improved? Nothing.

The Kessler file wrapper indicates that he was attempting to solve the problem of through-metal conductivity. In his patent Kessler states: "Due to the high heat conduction properties of metals, and the usual heat differential between the inside and outside atmosphere and associated with a building, a rapid heat transfer by using low heat conducting properties of non-metallic or insulating materials in association with the metal sections results in substantial economies. Furthermore, due to such rapid heat transfer, the water vapor within the building tends to condense on the cold surfaces of the metal window frames and sash, often damaging and fostering corrosion * * *." Col. 1, lines 10–29. One of Kessler's objectives, he states, is to "* * * insulate the members by interposing a material of low heat conductivity, breaking the metallic continuity of the metal members between the exterior and interior sur-

faces \* \* \* thereby substantially reducing the heat transfer." Col. 1, lines 32–39.

Kessler uses "sturdy insulating members in combination with the metallic members forming the window closure to give support to the structure and increase the ability to withstand varying atmospheric pressures. Col. 1, lines 45–49. The "sturdy insulating members" refers to the "rigid non-metallic element of low heat conductivity" mentioned in the Kessler claims.

The prior art teaches and anticipates everything which Kessler has patented and described in his specifications. The elements of rigid non-metallic supporting insulator, with inner and outer metallic channels retained in a spaced apart relationship is taught by several of the prior art references. Mr. Fishleigh testified that the objectives of the Kessler patent are "accomplished by several of the prior art structures." Kessler's combination patent clearly incorporates much of the prior art. It is appropriate to consider all the relevant prior art. Richmond Screw Anchor Co. v. Umbach, 173 F.2d 521 (7th Cir. 1949) and Noble Company v. C. S. Johnson Company, 139 F.Supp. 868 (E.D.Ill.1956).

Great Atlantic and Pacific Tea Co. v. Supermarket Equipment Corp., 340 U. S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950), is apposite, wherein it is said: "The courts below concurred in the finding that every element here claimed (except extension of the counter) was known to prior art. When, for the first time, those elements were put to work for the supermarket type of stores, although each performed the same mechanical function for them that it had been known to perform, they produced results more striking, perhaps, than in any previous ultilization. To bring these devices together and apply them to save the time of the customer and checker was a good idea, but scores of progressive ideas in business are not patentable, and we conclude on the findings below that this one was not."

It should be noted that plaintiff's argument in respect to the prior art was particularly weak, almost to the point of being glaring by its silence. The cross-examination of Fishleigh regarding the prior art was *de minimis.*

## PATENT IN SUIT IS OBVIOUS

The Kessler patent is obvious in light of the prior art, and therefore it is invalid. 35 U.S.C.A. § 103. Quite simply, "This patentee has added nothing to the total stock of knowledge, but has merely brought together segments of prior art and claims them in congregation as a monopoly." Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., supra.

Kessler has been cast as the person who solved a long standing problem; that he was presented with the problem of designing a window frame for the Sargent Building in 1949; and that within a month or so he returned with a practical solution. This Court believes there was no such long standing problem, but that even if there was, it was effectively solved by certain of the prior art, referred to above. Further, the commercial success of Kessler will not make it patentable, where the device is obvious and wanting in invention. Great Atlantic & Pacific Tea Co., supra.

An inventor is bound to know what the relevant prior art teaches. With such knowledge, the person skilled in this art could perceive without inventive genius the Kessler frame; he could extrapolate the prior art principles and solutions. The skilled mechanic could then vary details of design to suit his needs and still come within the purview of the prior art. Firestone v. Aluminum Co. of America, 285 F.2d 928 (6th Cir. 1960); Keuffel & Esser Co. v. Pickett & Eckel, Inc., et al., 182 F.2d 581 (7th Cir. 1950).

This Court finds that the Kessler insulated window frame is the result of mechanical skill exercised by one having knowledge in the field and not the result of inventive or creative genius. Cold Metal Products Company v. E. W. Bliss Company, 285 F.2d 244 (6th Cir. 1960).

766

■ A patent is invalid if from one or more instances of the prior art, an individual having ordinary skill in the art would have concluded that the alleged invention was obvious or that it was the product of mere mechanical skill. Enterprise Railway Equip. Co. v. Keystone Railway Equip. Co., 267 F.2d 102 (7th Cir. 1959); Hobbs v. Wisconsin Power & Light Co., 250 F.2d 100 (7th Cir. 1957); and Helms Products, Inc. v. Lake Shore Mfg. Co., Inc., 227 F.2d 677 (7th Cir. 1955).

Compare the present case with Ekstrom-Carlson & Co. v. Onsrud Machine Works, Inc., 298 F.2d 765 (7th Cir. 1962). In that case, the aircraft industry desperately needed a metal router which would work effectively with the heavier and thicker metals used in modern aircraft. The industry had long attempted to solve the problem; indeed the industry devoted considerable attention to the problem in its own research facilities. It also asked its suppliers to solve the problem. Mann, the inventor, applied power actuators to the arms of routers. The invention was immediately accepted and used by the industry. The court rejected the argument that the invention was obvious, stating: "Further, the fact that Mann produced his patented machine within a relatively short time, after receiving an invitation to solve the problem, does not necessarily point to obviousness but rather, in our opinion, is one indication of inventive genius." Ekstrom-Carlson & Co. is distinguishable from the present case because the state of the prior art is different and because the urgency or demand for the device was not as great. Further, the prior art in the present case clearly teaches and illustrates various solutions to the problem. In light of the prior art, "creative genius" is lacking; and, hence, the Kessler patent is invalid because it is obvious within the meaning of section 103, of 35 U.S.C.A.

■ This Court is not unmindful of the powers of hindsight. Hindsight cannot make today's simple device obvious at the time of the application for the patent. It cannot make simple today what was revealed only by creative genius yesterday. Nevertheless, the Kessler window frame is not a revolution, but only a slight evolution in the efforts to solve the problem of through-metal conductivity. His improvements or refinements, if any, over the prior art are not of sufficient moment to be given the dignity of invention, when a person skilled in this art, exercising only ordinary skill, could design a window frame such as Kessler designed.

## PRIOR USE AND SALE

A full and complete embodiment of the Kessler window frame was not produced until after May 27, 1949. The record discloses, however, that Kessler commenced working on the insulated window frame late in December, 1948, or early in January, 1949. This was at the request of Olsen and Urbain, architects, who were then designing the Sargent Building in Chicago. They wanted to incorporate an insulated window frame into the plans, but were not aware of any suitable structure.

At Kessler's first meeting with Olsen and Urbain, he and a Mr. Sandstrum, discussed the matter. Sandstrum, an architect with the firm, had some supervisory capacity over the Sargent Building project. Kessler dictated and Sandstrum drew several designs for the window at their first meeting.

Sandstrum's deposition was read into the record. He is a licensed architect. For some twenty years he worked with Olsen and Urbain. The Sargent project was the first air-conditioned building they designed. They were aware of the condensation problem, but lacked adequate knowledge about a solution. After some preliminary sketches, Kessler returned to Sandstrum's office. Following is part of his deposition:

"A. I can't remember whether he came back with just sketches, or possibly whether he brought back a crude model,—a mockup.

"Q. What did that model consist of?

"A. Well, the model could have been something in the nature of the size of the frame, the section that might be feasible to work with for the size window we had.

"Q. Did he had a mock-up with him at that time?

"A. I say I don't remember whether at that time he had one. I know that one came through later; but he might have come back with just samples of the available extrusions that he could purchase, along with drawings of the complete sections through the frame.

\* \* \* \* \* \*

"Q. Did you have any ideas at the time as to what the outer and inner section of the frame were going to be like?

"A. As far as the aluminum extrusions?

"Q. Yes.

"A. Yes. Basically, we had samples of the metal. In other words, we just took what was available and separated it with a wood section that might be feasible core.

"Q. I see. When is the earliest time that you recall that he brought in a model?

"A. Well, I would say that it could have been within the first month of when I contacted him.

"Q. Did the sample that he brought in have any resemblance at all to the structure which has been identified as Olsen Exhibit 2?

"A. Yes. Generally, that was it.

\* \* \* \* \* \*

"Q. Did Mr. Kessler offer this model, this sample, as something that he was prepared to manufacture for you?

"A. Yes.

\* \* \* \* \* \*

"Q. I show you Olsen Exhibit 2 for identification.

"A. Yes.

"Q. Have you ever seen a sample like this previous, for instance, to the date of Exhibit 1?

"A. Do you mean prior to that date?

"Q. Yes.

"A. Have I ever seen examples of something like that prior to that date?

"Q. Yes.

"A. No.

"Q. I mean, furnished by Kessler.

"A. Furnished by Kessler?

"Q. Yes.

"A. No, I have never seen it.

"Q. Kessler brought no samples with him at any time?

"A. No, not that I know of. I think that if he had a sample he would have brought it in.

"Q. No, I don't think that you understand my question.

"During the course of these exchanges, when Mr. Kessler would come into the office here in connection with the Sargent job, did he bring with him samples like Olsen Exhibit 2 for you to see?

"A. During the course of the development of this window?

"Q. Yes.

"A. This is one point that I can't remember, whether he did.

"I had assumed that he brought in some mock-up of something, maybe very crude, but something to give us an idea of scale or size, and also for the general assembly of it.

"Now, whether that was actually the final product or not, I cannot remember. He might have gone back and modified this half a dozen times, and redesigned.

"Q. Do you mean as far as design features are concerned?

"A. When we are talking about design we are talking about appearance. Design can also involve construction, and that is where he comes into the picture."

The deposition of Lief E. Olsen, Jr. was, in part, read into the record. He was a draftsman for Olsen and Urbain at the time of the Sargent project. Sandstrum and Olsen had their offices in the same room. He recalled that Kessler was in the office to discuss the windows for the project. Following is part of his deposition:

"Q. Do you recall any time when he brought samples with him of any kinds?

"A. I recall—it is sort of difficult to determine exactly whether this occurred at that time or not.

"I recall his bringing samples into the office and discussing these windows, because the development was going on at the time that the Sargent job was being done. But I am not certain whether it was that one or some subsequent job, or during the course—subject to the letting of contracts or not.

"There was definitely conferences over this window, and he definitely brought samples. For me to pinpoint it would be rather difficult at this time."

 There was prior sale and use in this case within the meaning of the Patent Act, even though a completed window frame was not sold and exchanged more than one year prior to the date of the application for the patent. Section 102, of 35 U.S.C.A. provides:

"* * *

"(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or"

 It is the placing on sale, or what I would denominate, the making available for use by another, that is contemplated by section 102. What is required, after the experimental stage has been passed, is that the invention be reduced to practice and the device manufactured in its perfected form. Magee v. Coca-Cola Company, 232 F.2d 596 (7th Cir. 1956).

There seems to be no substantial problem here even though the device was not "manufactured in its perfected form". This Court finds that Kessler presented his ideas fully on paper and his teachings fully reduced to physical form, without restriction or reservation as to use, from which one skilled in the art could readily build and use a frame such as Kessler had designed. This is sufficient to amount to a manufactured device. This determination must be understood in light of the facts of this case.

The architects had no readily available solution to the problem regarding the windows for the Sargent project. They consulted with Kessler and considered his ideas. The record discloses that Kessler brought drawings and samples of his idea to Olsen and Urbain. But this was not enough. The architects had to be satisfied that the frame would accomplish its intended purpose. The architects were reluctant to experiment with their client's money. Kessler satisfied the architects. His frame was thereupon incorporated into the working drawings, which were sent out to contractors for competitive bidding. Part of their uncertainty was as to whether Kessler could supply the windows in the amount needed.

Sandstrum's deposition related the following:

"A. * * *

"In other words, we couldn't experiment with the owner and spend his money unless we were reasonably sure that this kind of a window was going to work out and perform.

"Secondly, we had to sell the owner on the idea that it was well worth the money that it was going to cost.

\* \* \* \* \* \*

"Q. Did Mr. Kessler offer this model, this sample, as something that he was prepared to manufacture for you?

"A. Yes."

Reference was to Exhibit 17, which is a portion of the proposed window frame intersecting at right angles. The sample discloses the details of the frame which were ultimately incorporated into the Kessler patent.

The following was also read into the record from Sandstrum's deposition:

"Q. At the date of that, had you satisfied yourself that Kessler was able to manufacture these windows?

"A. Yes, or we would never have gone along and incorporated them in the drawings [Exhibit 71, which is two sheets of blueprints for the Sargent project], because, to our knowledge——.

"Q. Do you see them incorporated in the drawings?

"A. Yes, right here (indicating).

"Q. Now, had you satisfied yourself prior to the time that you submitted this drawing [Exhibit 71] that Kessler was able to manufacture these windows?

"A. Yes."

Kessler had sufficiently reduced his device to practice more than one year prior to the filing of his application. In Farrand Optical Co., Inc. v. United States, 325 F.2d 328 (2nd Cir. 1963, it is said: "However, Tipp's invention can be considered to have been sufficiently reduced to practice if the scope of that invention is limited to the components embodied in the mock-up, namely, to claim 4." In that case, a gun-sight for bombers was invented. The inventor had utilized his optic principles, having incorporated them into a simple box, crude at best. The device had never been tested in an airplane. The Court of Appeals cited the district court's opinion as follows: "After it was inspected, examined and operated, the invention was found by these men skilled in the art to be a satisfactory answer and a solution to the problem the Air Force could not resolve \* \* \*"

In Minnesota Mining & Mfg. Co. et al. v. Van Cleef et al., 139 F.2d 550 (7th Cir. 1943), it is said: "[R]eduction to practice of an invention can be completed by production of the article and the testing of it by an inexact practical test showing its operative character to a man skilled in the art \* \* \*." And further, "While an invention need not be followed by commercialization to establish its completion, yet we feel that the reduction to practice should be sufficient to warrant the parties to commercialize the product within a reasonable time if they so desire." This is exactly what occurred in the case at bar.

Quite apposite is Electro-Metallurgical Co. et al. v. Krupp Nirosta Co., Inc., 122 F.2d 314 (3rd Cir. 1941), wherein it is said: "Moreover, in order to reduce an alleged invention to practice, it is necessary for the inventor to conceive correctly his invention. The conception is the mental part of the process in arriving at invention and conception is evidently established when it is demonstrated that sufficient reasoning has taken place so that the inventor fully understands and can describe the invention whereby it may be explained to others." Kessler started with merely a raw idea. More than one year prior to the filing of his application for a patent he sufficiently explained his idea, including the use of models, so that the architects were satisfied as to its practical utility. Kessler taught Olsen and Urbain enough so that they incorporated his hitherto untried device in their blue-prints. Kessler reduced his device to sufficient form so as to enable practical use of it. Pyrene-Minimax Corporation v. Palmer et al., 63 App.D.C. 33, 89 F.2d 505 (1937).

What Kessler did is well stated in Kraft Foods Co. v. Walther Dairy Products, et al., 118 F.Supp. 1 (W.D.Wis. 1954), wherein it is said: "There can be no reduction to practice unless the inventor knows what he is doing so that he can duplicate the process and teach the public how to duplicate it." See also, Field v. Knowles, 183 F.2d 593, 37 C.C.P.A. 1211 (1950), cited in Kraft Foods.

The conclusion is inescapable that Kessler laid before Olsen and Urbain his full thinking regarding the window frame—its principles, design and functional operation. It is inconceivable that Olsen and Urbain would have adopted the Kessler window had they not had a full disclosure and understanding of his frame. Suffice-it-to-say, Kessler's window was sufficiently manufactured. Olsen and Urbain and the various general contractors, to whom the blue-prints incorporating the Kessler window were sent, were under no limitation as to secrecy or disclosure of the Kessler idea. Randolph v. Allis-Chalmers Mfg. Co. et al., 264 F.2d 533 (7th Cir. 1959). Kessler unequivocably gave his ideas to the public more than one year prior to the date of his application for a patent.

DEFENDANT'S INFRINGEMENT

In Halstead v. Globe Hoist Co., 141 U.S.P.Q. 465, 469, 231 F.Supp. 1012, 1017 (D.C.N.D.Cal.1964), it is said: "But to completely dispose of the case, the court now decides the issue of infringement, assuming for that purpose that the '978 patent is valid." See, also, Bain v. M. A. Hanna Co., 331 F.2d 974 (6th Cir. 1964). This hypothesis is necessary in considering infringement because it is clear that an invalid patent cannot be infringed.

Marmet would infringe on Kessler if it did the same work in substantially the same way and accomplished the same result. There would be infringement even though there is a difference in name, form or shape. Craver Tank & Mfg. Co., Inc., et al. v. Linde Air Products Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950); Hobbs v. Wisconsin Power & Light Company, 250 F.2d 100 (7th Cir. 1957); Nordberg Mfg. Co. v. Woolery Mach. Co., 79 F.2d 685 (7th Cir. 1935); and Kraft Foods Co. v. Walther Dairy Products et al., 118 F.Supp. 1 (W.D.Wis.1954).

To the foregoing principle there is an exception. "Conceding that the functions of the two devices are practically the same, the means used in accomplishing this function are so different that we find it impossible to say, even in favor of a primary patent, that they are mechanical equivalents." Westinghouse v. Boyden Power Brake Company, 170 U.S. 537, 18 S.Ct. 707, 42 L.Ed. 1136 (1898).

There are numerous differences between Kessler and Marmet. With one exception the differences are patentably unimportant. For example, Kessler used identical in size and shape inner and outer metallic channels to enclose the insulator; Marmet does not. Kessler secured the channels to the insulator by means of tongue and groove, slidably interrelated; Marmet used only glue. Kessler secured the glazing strips by either screws or sliding channels; Marmet uses a sliding glazing strip for the exterior side, while on the interior side, the inner metallic channel has an extending flange which serves as the glazing strip. Kessler emphasized that in his invention the glazing rests upon the insulator, either directly, as stated in his patent, or on blocks interposed between the glazing and the insulator, as is required by certain glass manufacturers. The latter point being brought out during oral argument. In Marmet, the glazing does not rest, directly or indirectly, upon the insulator. It rests upon the metallic channels. In fact, except for a single pane of glazing, the Marmet frame could not accommodate a double glazing panel between the metallic channels.

Kessler uses a wooden insulator; Marmet uses a plastic insulator. This is not *per se* a substantial difference. It is merely the substitution of one known ingredient for another. The change, based solely on the substitution of materials, is obvious. E. A. Staley

Mfg. Co. v. Old Rock Distilling Co., Inc., 223 F.Supp. 798 (W.D.No.Sw.D.1963). However, Marmet claimed at oral argument that its plastic insulator was unique in that its co-efficient of expansion under varying temperatures was the same as that of the metallic channels, thus permitting the use of only glue to secure the channels to the insulator.

There is a difference between Kessler and Marmet which is determinative of the question of infringement. It is that Kessler and Marmet use substantially different means to achieve the same result. Marmet does not read directly upon the Kessler claims in material respects. Bauer v. Yetter Manufacturing Co., Inc., 315 F.2d 377 (7th Cir. 1963). The difference lies in the function of the insulating member, aside from its use to provide the thermal-break, taught by the prior art.

It is evident from reading the specifications that the wooden insulator forms the main structural element in the Kessler patent, with the side channels adding some additional strength to the unit as a whole. Kessler states: "Its width and thickness should be sufficient to adequately support the weight of the double glazed unit without distortion." Col. 3, lines 43–45. "If the glass block is used instead of the double glazed unit 26, the space between the inturned legs of the members 34 and 35 must be sufficient to accommodate such block, and accordingly, will require members 34, 35 and 43 to be of heavier construction in order to bear the increased weight and additional stress". Col. 4, lines 4–11.

The glazing rests on the wood insulator between the channels. The function of the wood in Kessler is so important that the only fair description of the Kessler device is that it is a wooden window frame the visible portions of which are capped by suitably attractive metal strips. The file wrapper states that: "By combining the metal sections 34 and 35 with the member 43, as described above, the metal sections are separated completely from each other, yet to external appearances the closure is metal, the member 43 being concealed in the construction as illustrated * *."

The Kessler claims speak of a rigid non-metallic element, which in claim 1 is laminated wood, plywood. The claims however must be read in light of what meaning the patentee has attributed to them. The claims must be read in light of the specifications. Reference in the claims to rigid insulator must of necessity refer to a rigid and structurally strong wooden insulator, capable of bearing the weight of the glazing used in a particular installation.

Marmet does not rely on the insulator for strength or structural purposes. Marmet's insulator is not secured to the building, as is Kessler. In Marmet, the outer channel is the main structural element which is attached to the building. It is the outer metallic channel in Marmet which is varied in size, according to the weight and size the glazing used. Regardless of the size of the glazing used, the insulator never changes in form, shape or size. In comparison to the Kessler insulator, the plastic unit in Marmet is structurally inadequate to support glazing in accordance with Kessler's teachings. The Marmet insulator is quite flexible compared to the plywood used by Kessler. Marmet can achieve a thermal-break with its flexible insulator because only a small gap is required to perfect its metal insulated window frame.

Kessler and Marmet have used substantially different means to achieve the same result. Kessler is not a pioneer in the field; accordingly, the range of equivalents is narrower. Marmet employs different means of operation to achieve its result. Universal Match Corp. v. New Castle Products, Inc., 308 F.2d 842 (7th Cir. 1962) ; Fife Manufacturing Company v. Standard Engineering Co., 299 F.2d 223 (7th Cir. 1962) ; and Flowers v. Austin-Western Co., et al., 149 F.2d 955 (7th Cir. 1945) The material elements of Kessler are not present in Marmet.

Every element in the patent in suit and the accused structure must

772

be present. There can be no infringement unless all the elements are found in both structures. Reiner v. I. Leon Co., 324 F.2d 648 (2nd Cir. 1963); Lockwood v. Langendorf United Bakeries, Inc., 324 F.2d 82 (9th Cir. 1963); and Jogger Mfg. Corporation v. Roquemore, 118 F.2d 867 (7th Cir. 1941). Marmet does not respond to the claims of the patent in suit. Sterling Varnish v. Louis Allis Co., 145 F.Supp. 810 (E.D.Wis. 1956). Marmet has adopted the prior art principles rather than the inventive features of Kessler. Elgen Mfg. Corp. v. Ventfabrics, Inc., 314 F.2d 440 (7th Cir. 1963) and Dixie-Vortex Co. v. Paper Container Mfg. Co. 130 F.2d 569 (7th Cir. 1942). A substantial piracy of the substance of plaintiffs' invention has not been shown. V. L. Smithers Manufacturing Company v. O'Brien, 227 F.Supp. 472 (S.D.Ill.N.D.1964).

ATTORNEY FEES AND COSTS

Attorneys fees are not allowed to either side. This is not the exceptional case within the meaning of 35 U.S.C.A. § 285. Attorney fees do not follow, as in ordinary lawsuits, as a matter of course. Apex Electrical Manufacturing Company v. Altorfer Bros. Company, 238 F.2d 867 (7th Cir. 1956).

It does not appear that the suit was commenced with a lack of good faith. Many of the issues were closely litigated and seriously presented.

The Kessler Patent, No. 2,654,920, granted October 13, 1953, (a) was anticipated by the prior art; (b) was obvious in light of the prior art; and (c) was on sale more than one year prior to the date of the application for the patent. The Kessler Patent is therefore invalid in its entirety.

If the Kessler Patent was valid, nevertheless, the Marmet window frame does not employ the same means in achieving a result similar to the Kessler window frame. Marmet, therefore, does not infringe upon the Kessler Patent.

Judgment is ordered for the defendant, dismissing the complaint of the plaintiffs on the merits. Attorney fees are not allowed to either plaintiffs or defendants. Defendant will prepare a judgment in conformity with this opinion.

The foregoing opinion incorporates the Court's findings of fact and conclusions of law in conformity with Rule 52, Federal Rules of Civil Procedure.