**ENVIROTECH CORPORATION, Plaintiff,**

v.

**WESTECH ENGINEERING, INC., et al., Defendants.**

**Civ. No. 86–C–0671A.**

United States District Court, D. Utah, C.D.

May 18, 1989.

William S. Britt of Trask, Britt & Rossa, Salt Lake City, Utah, for plaintiff.

Earl D. Tanner, Sr. of Tanner, Bowen & Tanner, and Richard F. Bojanowski, Salt Lake City, Utah, for defendants.

## MEMORANDUM OPINION

(Under Rule 52(a)—In Lieu of Findings of Fact and Conclusions of Law)

ALDON J. ANDERSON, Senior District Judge.

The defendants in this patent infringement action maintain that the plaintiff's patent is invalid because the invention it covers was "on sale" more than a year before the date on which the patent application was filed. The defendants raised this issue of "on sale" bar by way of a motion for partial summary judgment. The court heard argument on the motion on January 18, 1989 and determined, with the parties' consent, that an evidentiary hearing should be held.

The evidentiary hearing lasted several days, with closing arguments presented on March 23, 1989. William S. Britt and Allen C. Turner represented the plaintiff, Envirotech Corporation ("Envirotech"). Richard F. Bojanowski represented the defendant Westech Engineering, Incorporated ("Westech"). Earl D. Tanner and Brad L. Englund represented the defendants Lowell L. Palm and James V. Larsen.

## FACTUAL BACKGROUND

On February 21, 1980, Envirotech submitted a bid to provide a digester cover for use at a wastewater treatment plant in Madison, Wisconsin. Envirotech's proposal referred to a requirement that the contractor who bought the cover must furnish 118,000 pounds of concrete ballast to meet pressure requirements. The price for the digester cover was $205,000. (Exhibits D–101 & D–103.)

The traditional method for ballasting a digester cover involves a solid concrete block. About March 5, 1980, two Envirotech employees, Lynn W. Cook and David P. Brown, conceived the idea of making a digester cover which is ballasted with tub-shaped blocks called a "hydroballast." On March 26, 1980, Cook and Brown made an Invention Record and a Disclosure of Invention which contained drawings and explanations of their ballasting digester cover (Exhibits D–104 and D–105). They stated in the Invention Record that there was no need for testing of the invention (Exhibit D–104).

The mechanical contract portion of the Madison project was not let to any bidder but was scheduled for re-bid on May 8, 1980 (Exhibit C to Affidavit of James Douglas).

At a meeting held on April 9, 1980, Envirotech described its idea for the ballasting digester cover to CH2M–Hill, the engineers for the Madison project. Envirotech planned to submit a proposal which would include "precast ballast blocks" in the price but would keep the design of the blocks confidential. The blocks would then be cast according to "Lynn Cook's design." (Exhibit D–106.)

On April 28, 1980, Envirotech sought a price quotation for making tub-shaped ballast blocks from concrete contractors in Madison, Wisconsin. By that time, drawings were made and calculations were performed which established the shape, size and function of the ballasting digester cover (Exhibit D–107).

Thus, Envirotech intended to provide a hydroballast system for the Madison project (Deposition of Jon Coombs, at 36).

By letter dated May 6, 1980, a patent attorney for Envirotech informed Cook and Brown that the pending bid on the Madison project would be an offer of sale of the ballasting digester cover and that a patent application must be filed within a year of the bid (Exhibit D–115).

Between May 5 and 8, 1980, Envirotech submitted a second bid on the Madison project to Hooper Construction Corporation ("Hooper"), the mechanical contractor. Envirotech proposed using a ballasting digester cover, at a cost of $134,000. (Exhibits D–110, D–113 & D–117.) Hooper accepted the offer on May 8, 1980.

On May 30, 1980, Envirotech submitted a detailed description of the ballasting digester cover to the engineers of the Madison project. Envirotech pointed out that this "innovative approach" had been "suggested during the formative stages of this job" (Exhibit D–116). Shop drawings which were subsequently used in construction of the Madison project contain the same dimensions, clean-out pipes and caps, tie-downs and concrete shape and quantity as the April 28, 1980 drawings (Exhibit D–154).

By letter dated October 6, 1980, Envirotech clarified that the buoyant chamber called for in the specifications had been replaced by a hydroballast (Exhibit P–15).

Cook and Brown applied for a patent on May 29, 1981 (Exhibit D–147). Later, they assigned their patent application to Envirotech.

U.S. Patent No. 4,391,705 (the "Cook Patent") was granted (id.). The digester cover used at the Madison project embodies all of the limitations of all of the relevant claims of the Cook Patent.

The function of the hydroballast itself can be determined by calculations which are within the normal skill and knowledge of engineers based upon the weight and volume of concrete in the block and the weight and volume of sludge which will be contained in the block upon emergence and submergence.

Nothing in the Envirotech's oral or written agreements regarding the Madison project suggests that the ballasting digester cover was meant for experimental or test purposes, and Envirotech made no arrangement for testing the operation of the ballasting digester cover at the Madison project.

## DISCUSSION

The statute governing the on-sale bar in patent law provides that a person shall be entitled to a patent unless

the invention was … in public use or on sale in this country, more than one year prior to the date of application for the patent in the United States.

35 U.S.C. § 102(b).

Patents are presumed valid under 35 U.S.C. § 282, and an attack on their validity requires proof of facts by "clear and convincing evidence." *Buildex, Inc. v. Kason Industries, Inc.*, 849 F.2d 1461, 1463 (Fed.Cir.1988).

The party asserting the "on sale" bar has the burden of showing "that there was a definite sale or offer to sell more than one year before the application for the subject patent, and that the subject matter of the sale or offer to sell fully anticipated the claimed invention or would have rendered the claimed invention obvious by its addition to the prior art." *UMC Electronics Co. v. U.S.*, 816 F.2d 647, 656 (Fed.Cir. 1987), *cert. denied,* — U.S. —, 108 S.Ct. 748, 98 L.Ed.2d 761 (1988). If these facts are established, "the patent owner is called upon to come forward with an explanation of the circumstances surrounding what would otherwise appear to be a commercialization outside the grace period." *Id.* at 656.

The issue of whether an invention was "on sale" is a question of law. *Id.* at 657; *Barmaq Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*, 731 F.2d 831, 836–37 (Fed.Cir.1984). The general standard for determining whether or not an invention was "on sale" outside the grace period was enunciated in *Timely Products Corporation v. Arron*, 523 F.2d 288 (2d Cir.1975). First, "[t]he complete invention claimed must have been embodied in or obvious in view of the thing offered for sale." At 302. Second, "[t]he invention must have been tested sufficiently to verify that it is operable and commercially marketable." *Id.* In other words, "an invention cannot be offered for sale until it is completed, which requires not merely its conception but its reduction to practice." *Id.* Finally, "the sale must be primarily for profit rather than for experimental purposes." *Id.* *See also King Instrument Corp. v. Otari Corp.*, 767 F.2d 853, 859–60 (Fed.Cir.1985), *cert. denied*, 475 U.S. 1016, 106 S.Ct. 1197, 89 L.Ed.2d 312 (1986); *UMC Electronics*, 816 F.2d at 651.

■ Envirotech argues that the three-part standard is not met in this case. First, Envirotech says the invention covered by its Cook patent was not offered for sale until at least May 30, 1980 when Envirotech sent detailed information about the hydroballast to the engineers, hoping to convince them to substitute it for the buoyant chamber called for in the specifications. Second, Envirotech insists that the invention was a mere conception at the time of the May 8th bid. Finally, Envirotech argues that the initial use of the invention at the Madison project was meant to be experimental.

Most courts focus on the first and second factors in determining whether the on-sale bar applies; that is, whether there was a sale or offer of sale of the invention and whether the invention was reduced to practice by the time of the offer. *E.g., King Instrument*, 767 F.2d at 860.

The statute proscribes placing the invention on sale, not just selling it. Accordingly, an offer is sufficient to invoke the on-sale bar even if it was subsequently rejected. *Id.; UMC Electronics*, 816 F.2d at 653. "While a bare, unexplained offer, not explicitly shown to be of the new invention, may be insufficient, the totality of the circumstances must always be considered in order to ascertain whether an offer of the new invention was in fact made." *King Instrument*, 767 F.2d at 860.

This generally means that when an executory sales contract is offered or entered into before the critical date,[1] the purchaser must know how the invention embodied in the offer will perform. *Id.* However, because the policies underlying the on-sale bar concentrate on the attempt by the inventor to exploit the invention, rather than the potential purchaser's cognizance of the invention, "the purchaser need not have actual knowledge of the invention for it to be on sale." *Id.*

In this case, it is clear from all the circumstances that Envirotech made its May 8th bid with the intent of exploiting the hydroballast invention and with knowledge of how the invention would perform, whether or not the engineers or Hooper had actual knowledge of it.

■ The second factor, whether an invention must be reduced to practice before the alleged offer or sale, has been a subject of much dispute. In a cogent analysis of the applicable case law, the court in *UMC Electronics*, concluded that "reduction to practice of a claimed invention is not and should not be made an absolute requirement of the on-sale bar." 816 F.2d at 656. The court explained:

We do not reject "reduction to practice" as an important analytical tool in an on-sale analysis. A holding that there has or has not been a reduction to practice of the claimed invention before the critical date may well determine whether the claimed invention was in fact the subject of the sale or offer to sell or whether a sale was primarily for an experimental purpose.... Thus, we simply say here that the on-sale bar does not necessarily turn on whether there was or was not a

---

1. The critical date is defined as one year before the filing of the patent application.

reduction to practice of the claimed invention. All of the circumstances surrounding the sale or offer to sell, including the stage of development of the invention and the nature of the invention, must be considered and weighed against the policies underlying section 102(b).

*Id.*

In *Pfaff v. Wells Electronics, Inc.,* 9 U.S.P.Q.2d (BNA) 1366 (N.D.Ind.1988), the court held that the "on sale" bar was not violated because the invention was not reduced to practice at the time of the alleged sale activity. The court explained that the invention was a mere conception "described on paper in the form of mechanical drawings." At 1375. It had not been constructed or tested. However, "in order for there to be a reduction to practice, there is no requirement that the invention when tested be in a commercially satisfactory stage of development." *King Instrument,* 767 F.2d at 861.

The invention in *Pfaff* was a rather complicated device for holding sockets for leadless chip carriers. 9 U.S.P.Q.2d at 1367. "[S]ome devices are so simple and their purpose and efficacy so obvious that their complete construction is sufficient to demonstrate workability." *King Instrument,* 767 F.2d at 861, quoting *Eastern Rotorcraft Corp. v. U.S.,* 384 F.2d 429, 431, 181 Ct.Cl. 299 (1967). Still other inventions may be sufficiently "reduced to practice" before they are constructed. For example, in *Langsett v. Marmet Corporation,* 231 F.Supp. 759 (W.D.Wis.1964), the inventor "presented his ideas on paper and his teachings [were] fully reduced to physical form ... from which one skilled in the art could readily build and use a frame such as [the inventor] had designed." At 768. The court found this "sufficient to amount to a manufactured device." *Id.*

The present case is more like *Langsett* than *Pfaff.* The ballasting digester cover is rather straightforward and its function can readily be calculated by persons with some engineering background. The inventors themselves indicated on their Invention Record that there was no need for testing it to predict how it would function.

In these circumstances, the invention had been sufficiently reduced to practice by April 28, 1980, when detailed drawings of it were made.

■ Similarly, the facts clearly showed that Envirotech's May 8th bid was made for commercial purposes and not to test the invention. There was no evidence that Envirotech conducted any tests after the May 8th bid or planned to conduct any testing at the Madison project within the immediate future.

A less stringent standard is appropriate in cases where strict application of the three-part test would frustrate underlying statutory policies. *King Instrument,* 767 F.2d at 860. Courts have emphasized that "rigid standards are especially unsuited to the on sale provision where the policies underlying the bar, in effect, define it." *UMC Electronics,* 816 F.2d at 653, quoting *Western Marine Elecs., Inc. v. Furuno Elec. Co.,* 764 F.2d 840, 844 (Fed.Cir.1985). "The area [of law] sought to be governed by these rules ... encompasses an infinite variety of factual situations which, when viewed in terms of the policies underlying § 102(b), present an infinite variety of legal problems wholly unsuited to mechanically-applied, technical rules." *UMC Electronics,* 816 F.2d at 654, quoting *Philco Corp. v. Admiral Corp.,* 199 F.Supp. 797, 815 (D.Del.1961). Thus, "[a]ll the circumstances surrounding the sale or offer to sale, including the stage of development of the invention and the nature of the invention, must be considered and weighed against the policies underlying section 102(b)." *UMC Electronics,* 816 F.2d at 656.

The policies underlying the on-sale bar include: (1) discouraging removal of inventions from the public domain which the public justifiably comes to believe are freely available; (2) favoring prompt and widespread disclosure of inventions; (3) giving the inventor a reasonable amount of time following the sales activity to determine the value of the patent; and (4) prohibiting an extension of the period for exploiting the invention. *King Instrument,* 767 F.2d at 860; *UMC Electronics,* 816 F.2d at 652. Congress provided the one-year grace peri-

od to balance these competing interests. *General Elec. Co. v. United States,* 654 F.2d 55, 61, 228 Ct.Cl. 192 (1981).

After considering the relatively straightforward nature of the invention and the evidence that it was fully developed without the need for testing, the court believes that these policies are best served by holding that the May 8th bid violated the "on sale" bar.

## CONCLUSION

The foregoing legal analysis leads the court to conclude as follows:

1.  No later than May 8, 1980, Envirotech placed on sale its ballasting digester cover, which embodies the entire invention set out in the Cook Patent, by bidding and proposing to sell it to Hooper for $134,000.

2.  Under all the facts and circumstances of the case, by May 8, 1980 when Envirotech made the bid, the invention was more than a "mere concept" but had been sufficiently reduced to practice to be commercially marketable. No further testing was necessary to ensure that it would function as intended.

3.  Envirotech's May 8th bid was made primarily for commercial rather than experimental purposes.

4.  Envirotech's May 8th bid and proposal to sell the cover violated the statutory bar of 35 U.S.C. § 102(b) in that the invention was "on sale" in this country more than one year before the application for a patent was filed.

Judgment will therefore be entered for the defendants on the issue of the patent's validity.