ENVIROTECH CORPORATION d/b/a
Eimco Process Equipment Company,
Plaintiff–Appellant,

v.

WESTECH ENGINEERING INCORPO-
RATED, James V. Larsen and
Lowell L. Palm, Defendants–Appellees.

No. 89–1596.

United States Court of Appeals,
Federal Circuit.

June 5, 1990.

Rehearing Denied July 2, 1990.

Suggestion for Rehearing In Banc Declined
Aug. 28, 1990.

Gordon L. Roberts, Parsons, Behle & La-
timer, Salt Lake City, Utah, argued for
plaintiff-appellant. With him on the brief
were Raymond J. Etcheverry, David G.

Mangum, C. Kevin Speirs. Also on the brief were William S. Britt and Thomas J. Rossa, Trask, Britt & Rossa, Salt Lake City, Utah, of counsel.

Earl D. Tanner, Sr., Tanner, Bowen & Tanner, Salt Lake City, Utah, argued for defendants-appellees. With him on the brief was Richard F. Bojanowski, Salt Lake City, Utah.

Before ARCHER, MAYER and PLAGER, Circuit Judges.

## OPINION

MAYER, Circuit Judge.

Envirotech Corporation appeals the judgment of the United States District Court for the District of Utah, 713 F.Supp. 372, 11 USPQ2d 1804 (1989), holding U.S. Patent No. 4,391,705 (Cook) invalid under 35 U.S.C. § 102(b) (1982). We reverse and remand.

### Background

The patented invention is a ballasted digester cover for use in wastewater treatment plants. Dubbed a "hydroballaster" by its inventors, Envirotech employees Lynn Cook and David Brown, the invention is a floating (as opposed to fixed) cover-type digester consisting of a circular steel top with cylindrical sidewalls that slide up and down telescopically inside a large cylindrical steel tank. The tank contains sewage sludge that, when digested by microorganisms, supplies a large volume of methane and other gases on which the cover "floats." Appropriately ballasting the lower rim of the cover enables it to maintain these gases at a predetermined and constant design pressure, making the gas available to fuel other components of the treatment facility.

Archimedes' Principle—that an object wholly or partially submerged in fluid is buoyed up by a force equal to the weight of the fluid displaced—dictates the ballast design of all floating cover digesters. The Cook invention implements this principle by attaching tub-shaped concrete blocks to the bottom of the cylindrical sidewalls of the floating cover. When submerged, these "hydroballast" blocks displace the same amount of sludge and therefore weigh the same as traditional, solid concrete blocks composed of an equal volume of concrete. Thus, because pressure is directly proportional to weight, the Cook invention achieves the same gas operating pressure as a traditionally ballasted digester when their respective ballasts are submerged. However, when a hydroballast block is emerged it outweighs an equal volume traditional block by the weight of the sludge filling the block cavity. Accordingly, the Cook invention can achieve a specified gas operating pressure using significantly less concrete than—or, conversely, attain a higher gas operating pressure using the same amount of concrete as—a cover ballasted only with traditional blocks when their respective ballasts are emerged.

It is principally the Cook invention's ability to attain a higher pressure differential between its submerged and emerged positions that makes it superior to a traditionally ballasted digester. Prior to the Cook invention, engineers using traditional ballast blocks resorted to various techniques to increase the achievable pressure differential. One technique was to construct the blocks of low-density concrete: the additional concrete volume necessary to equal the weight of an emerged, traditional density block displaced proportionately more sludge when submerged, thereby creating a larger weight differential between the emerged and submerged blocks and, thus, a larger pressure differential. A second technique, relevant here, combined traditional ballast blocks with an air-filled steel buoyancy ring. This technique allowed a higher pressure differential because of the increased buoyant force the ring provided when submerged.

Envirotech Corporation (Envirotech) is engaged in the design and sale of ballasted digester covers for use in municipal wastewater treatment plants. In response to a December 1979 invitation to bid on an addition to the Nine Springs Wastewater Treatment Plant in Madison, Wisconsin (Madison project), Envirotech submitted proposals for a digester cover to all general contrac-

tors bidding the mechanical portion of the project. In these February 21, 1980 proposals, Envirotech offered to provide for $205,000 a digester cover constructed in accordance with the plans and design specifications of the consulting engineer on the Madison project, CH2M–Hill (Hill). To achieve the desired gas operating pressure, the Hill design specified the use of traditional solid concrete ballast blocks together with an air-filled buoyancy ring constructed of steel.

For reasons not relevant here, Hill decided not to award the mechanical portion of the Madison project to any of the general contractor bidders. It instead scheduled a re-bid of this portion for May 8, 1980.

In the interim, Envirotech employees Cook and Brown conceived the hydroballaster invention and, in accordance with company policy, completed both an "invention record" and a "disclosure of invention." Both documents were stamped "confidential" and neither was sent outside the company. A May 6, 1980 letter from an Envirotech patent attorney to the inventors advised them of the receipt of their invention disclosure and said, "You mentioned that you were planning to bid and the bid would be the first offer for sale or public disclosure." Although Envirotech previously had described its idea for the hydroballaster to Hill in an April 9, 1980 meeting, it had kept the details of the design confidential. Two local concrete contractors in the Madison area were the only persons outside of Envirotech to know of the hydroballast block design: Envirotech had attached copies of a sketch of the blocks, marked "confidential," to April 28, 1980 letters seeking price quotations for block fabrication.

Sometime between May 5 and 8, 1980, Envirotech submitted its second proposal for the Madison project (the May 8 proposal) to all general contractors re-bidding the mechanical portion of the project. The proposal offered a "digester gas holder cover" —three times referencing the Hill specifications contained in the contract documents— for $134,000. When at the May 8 bid opening Hooper Construction Corporation (Hoo-

per) appeared as the lowest responsive bidder, it accepted Envirotech's proposal.

Subsequently, on May 30, 1980, Envirotech disclosed a detailed description of its hydroballaster to Hill as part of a required pre-award submittal. Envirotech acknowledged that it had "suggested" its innovative approach to Hill "during the formative stages of this job" but now included as part of the submittal both a description and detailed drawings of the hydroballaster: how it would operate and be constructed as well as the advantages it possessed over the Hill design.

Before the consulting engineer Hill decided whether to approve Envirotech's proposed design substitution, Hooper placed a purchase order with an Envirotech salesman on June 24, 1980. The order required Envirotech to furnish a digester cover "in accordance with proposal # 45–0379"—the May 8 proposal—"and spec. section 11385" —the section of the contract documents specifying the Hill design. On August 25, 1980, Hooper sent a confirmation of this purchase order to Envirotech and again specified that Envirotech must "[f]urnish in strict accordance with the attached Section 11385 of the Specifications and Plan Sheet[ ] D–S–17 [showing the Hill design] ... one complete digester gasholder cover...." Hill did not approve Envirotech's proposed substitution of its hydroballaster until September 17, 1980; not until October 6, 1980 did Envirotech apprise Hooper that it would furnish a hydroballaster instead of a Hill-designed digester cover.

Cook and Brown applied for a patent on the hydroballaster on May 29, 1981. They subsequently assigned the invention and application to Envirotech which, as the owner of the Cook patent, brought suit for patent infringement against Westech Engineering Incorporated (Westech) in 1986. In a motion for partial summary judgment Westech asserted the patent was invalid because of an on sale bar. After hearing argument and with the consent of the parties, the court held an evidentiary hearing.

Based on that hearing, the court invalidated the patent. It held that "Envirotech's May 8th bid and proposal to sell the

cover violated the statutory bar of 35 U.S.C. § 102(b) in that the invention was 'on sale' in this country more than one year before the application for a patent was filed." 713 F.Supp. at 377, 11 USPQ2d at 1808. The court based this holding on the three ancillary conclusions that "[n]o later than May 8, 1980, Envirotech placed on sale its ballasting digester cover, which embodies the entire invention set out in the Cook patent, by bidding and proposing to sell it to Hooper for $134,000"; that the invention had been "sufficiently reduced to practice to be commercially marketable" by May 8; and that the May 8th bid was made primarily for commercial rather than experimental purposes. *Id.*, 713 F.Supp. at 377, 11 USPQ2d at 1807–08. Envirotech appeals.

### Discussion

■ The party asserting the on sale bar must prove by "clear and convincing evidence," *Buildex, Inc. v. Kason Industries, Inc.*, 849 F.2d 1461, 1463, 7 USPQ2d 1325, 1326–27 (Fed.Cir.1988), "that there was a definite sale or offer to sell more than one year before the application for the subject patent, and that the subject matter of the sale or offer to sell fully anticipated the claimed invention or would have rendered the claimed invention obvious by its addition to the prior art." *UMC Electronics Co. v. United States*, 816 F.2d 647, 656, 2 USPQ2d 1465, 1472 (Fed.Cir.1987). Whether an invention is on sale is a question of law, and no single finding or conclusion is a *sine qua non* to its resolution. *Id.* at 657, 2 USPQ2d at 1471–72. "[T]he totality of the circumstances must always be considered in order to ascertain whether an offer of the new invention was in fact made." *King Instrument Corp. v. Otari Corp.*, 767 F.2d 853, 860, 226 USPQ 402, 407 (Fed.Cir.1985). The totality of the circumstances approach is necessary because "the policies or purposes underlying the on sale bar, in effect, define it." *RCA Corp. v. Data General Corp.*, 887 F.2d 1056, 1062, 12 USPQ2d 1449, 1454 (Fed.Cir.1989). These policies include discouraging removal of inventions from the public domain that the public reasonably has come to believe

are freely available; favoring the prompt and widespread disclosure of inventions; allowing the inventor a reasonable amount of time following sales activity to determine the potential economic value of a patent; and prohibiting the inventor from commercially exploiting his invention beyond the statutorily prescribed time. *King Instrument*, 767 F.2d at 860, 226 USPQ at 406.

■ As implicated here, none of these policies supports the on sale bar. First, the "public," that is, Hooper and the other general contractors that received Envirotech's May 8 proposal, could not have come to believe that the hydroballaster was freely available based upon that proposal. The district court's finding that "Envirotech made its May 8th bid with the intent of exploiting the hydroballast invention and with knowledge of how the invention would perform, *whether or not the engineers or Hooper had actual knowledge of it,*" 713 F.Supp. at 375, 11 USPQ2d at 1806 (emphasis added), suggests that neither Hill nor Hooper was sufficiently aware of the hydroballaster to justifiably believe that it was freely available. Moreover, because the court based its invocation of the on sale bar specifically on Envirotech's offer to sell the hydroballaster to *Hooper*, its finding that Envirotech had "described its idea" for the hydroballaster to the consulting engineer Hill prior to the critical date does not support its conclusion. Even if Hill had known how the invention would perform, in the absence of any relationship or evidence of communication between Hill and Hooper, that fact would be insufficient to establish that Envirotech offered the invention to Hooper.

■ Second, that Envirotech knew how the invention would perform is manifest but not dispositive. Knowing how an invention will perform is not the same as offering or intending to offer it for sale. The district court did not find that Envirotech either intended to or did offer the hydroballaster in its May 8 proposal. Citing testimony that Envirotech's bid strategy was to offer the Hill design and attempt later to substitute its patented invention,

the court found instead that Envirotech bid with the intent of *ultimately* exploiting the hydroballaster on the Madison project. *Id.*, 713 F.Supp. at 373, 11 USPQ2d at 1805. The distinction is important because, while we agree that the policies underlying the on sale bar concentrate on the inventor's attempt to exploit his invention rather than the potential purchaser's cognizance of it, *King Instrument*, 767 F.2d at 860, 226 USPQ at 407, the inventor's attempted exploitation must be objectively manifested as a definite sale or offer to sell the invention. The subjective, uncommunicated, and ultimate intention of the offeror, however clear, is not alone sufficient.

Here, the district court unduly focused on Envirotech's admitted motive. The record is clear that Envirotech neither definitely offered for sale nor otherwise exploited the Cook invention until after the critical date of May 29, 1980.

An internal Envirotech memorandum dated April 17, 1980 shows that Envirotech itself did not intend to offer the hydroballaster in its May 8 proposal.

> Regarding ballast, Hollie has a great idea to say in the proposal that we are providing precast ballast blocks that are included in our price. We should get a Salt Lake City quote without freight for Lynn Cook's [the patented] design and margin this at about ten (10%) percent *with every intention of breaking this out to the contractor after we bid the job. This way, we won't tip our hand to our design.*

The district court agreed that this language showed "Envirotech planned to submit a proposal which would include 'precast ballast blocks' but would keep the design of the blocks confidential." 713 F.Supp. at 373, 11 USPQ2d at 1805. But because the court also found that Envirotech "intended to provide a hydroballast system for the Madison project," *id.* at 374, 11 USPQ2d at 1805, it viewed the May 8 proposal as sufficient to invoke the on sale bar. In this, it erred.

Envirotech freely admits that it decided, prior to submitting its May 8 proposal, to attempt to substitute its patented invention for the Hill design—but only if it received the contract. Its internal price review meeting minutes and price estimate details prepared in anticipation of the May 8 bid clearly reflect that its strategy was to bid the Hill design but quote the lower hydroballaster price. But Envirotech's assuming the risk that Hill might disapprove its proposed substitution does not negate the fact that Envirotech remained obligated by the contract documents, incorporated into every proposal, to provide Hooper with a digester cover constructed according to the Hill design.

Contrary to Westech's assertions, the contract documents do not furnish the Hill design as an "example" of how to achieve the specified gas operating pressure. The design requirements contained in the documents are specific, not merely functional; Envirotech could not have bid its hydroballaster and met the requirements. The invitation to bid clearly requires all work to be done "as provided for in the Contract Documents," which include the drawings and specifications. The "general conditions" section of the documents states that the drawings "show the location, character, dimensions, and details of the work to be performed," and drawing D–S–17 clearly depicts the Hill design, with its traditional solid concrete ballast blocks and air-filled steel buoyancy chamber. The "summary of work" section of the documents similarly provides that "[d]etailed technical requirements for the work are stated in the applicable Specification sections and shown on the Drawings."

Furthermore, every bidder's proposal contained the proviso that "this Proposal is made according to the provisions and under the terms of the Contract Documents, which Documents are hereby made a part of this Proposal." Hooper's proposal in particular stated: "The Bidder further proposes to furnish and install in accordance with the Specifications, bound herewith, the items of equipment specified in section[ ] ... 11385." Neither Hooper in its proposal to Hill nor Envirotech in its proposal to Hooper noted any exceptions to the digester cover plans and specifications

contained in the contract documents. Specification section 11385, entitled "Digester Gasholder Cover," is clear (emphasis added):

> This section covers the work necessary to furnish and install, complete, one steel digester gasholder cover to be installed on the 80–foot inner diameter Storage Tank No. 3, *as shown on the Drawings.*
>
> \*   \*   \*   \*   \*   \*
>
> It is the intent of this Specification to functionally describe the gasholder cover, *as well as establish design criteria.* It shall be the responsibility of the cover supplier to design the cover to satisfy both functional *and construction specifications and submit supporting data according to this Specification.*
>
> *This tank cover will require a ballast ring with a buoyant chamber* in order to obtain the specified design pressure and relief pressure while maintaining a minimum rim submergence. Particular attention will be given to the submittal information describing the proposed method of attaining these design conditions.

The facts here thus differ markedly from those in *RCA,* which Westech relies on, and do not support an on sale bar. Here, the bid documents clearly specify the Hill design rather than the patented invention; there, they contained a technical description sufficient to identify the patented invention. 887 F.2d at 1060, 12 USPQ2d at 1452–53. Here, the district court found that Envirotech planned in its May 8 proposal to keep the patented design of its ballast blocks confidential, 713 F.Supp. at 373, 11 USPQ2d at 1805; there, testimonial evidence established that the offeror intended to offer the invention prior to the critical date. *RCA,* 887 F.2d at 1060, 12 USPQ2d at 1452.

▇ Finally, as noted above, Hooper understood that Envirotech's May 8 proposal offered the Hill design. While there is no requirement that the purchaser have actual knowledge of the invention to invoke the on sale bar, *King Instrument,* 767 F.2d at 860, 226 USPQ at 407, what the purchaser reasonably believes the inventor to be of-

fering is relevant to whether, on balance, the offer objectively may be said to be of the patented invention. Here, the court recognized that Hooper lacked actual knowledge of the invention. 713 F.Supp. at 375, 11 USPQ2d at 1806. More importantly, Hooper objectively interpreted Envirotech's May 8 offer to be of the Hill design. In both its Sedimentation Order Transmittal of June 24, 1980 and its follow-up purchase order of August 25, 1980, Hooper stressed that Envirotech must supply a digester cover in accordance with specification section 11385—the Hill design.

Other evidence the district court cites in support of its conclusion that Envirotech offered the Cook invention to Hooper prior to the critical date is unpersuasive. For instance, the fact that two Madison-area concrete contractors were shown sketches of the tub-shaped ballast blocks on April 28 for the purpose of providing price quotations is, given the lack of any evidence that the contractors shared their knowledge with Hooper, insufficient to establish that Envirotech similarly disclosed the invention to Hooper.

As for the May 6, 1980 letter from Envirotech's patent attorney to the two inventors, nothing in the record suggests that the attorney was familiar with the terms of Envirotech's May 8 offer. Yet the district court construed the reference in the letter to the "bid" that "would be the first offer for sale or public disclosure" as a reference to the actual Envirotech proposal instead of to the hydroballaster as identified in the invention disclosure—the document in reference to which the attorney wrote the letter. Moreover, because the district court did not find and the evidence does not suggest that the inventors themselves were responsible for formulating or submitting Envirotech's proposal, their knowledge of counsel's opinion is not evidence of whether Envirotech intended to offer the hydroballaster in its May 8 proposal. In fact, district court found that "Envirotech planned to submit a proposal which would include 'precast ballast blocks' in the price but would keep the design of the blocks

confidential." 713 F.Supp. at 373, 11 USPQ2d at 1805.

To be sure, the evidence amply supports the district court's conclusion that Envirotech intended ultimately to exploit the Cook invention on the Madison project. But it does not support the court's further conclusion that Envirotech offered the invention for sale prior to the critical date and, in particular, "[n]o later than May 8, 1980." *Id.* at 377, 11 USPQ2d at 1807. The totality of the circumstances does not support an on sale bar.*

### Conclusion

Accordingly, the judgment of the district court is reversed and the case is remanded.

### COSTS

Westech will bear the costs of this appeal.

REVERSED AND REMANDED.

---

\* Because we hold that Envirotech did not offer the hydroballaster for sale prior to the critical date, we need not address whether the inventors had sufficiently developed the invention as of the critical date.