**DONNELLY CORPORATION, Plaintiff,**

v.

**GENTEX CORPORATION, Defendant.**

**No. 1:93–CV–530.**

United States District Court,
W.D. Michigan,
Southern Division.

Aug. 29, 1995.

Court's subject matter jurisdiction and the extent of this Court's personal jurisdiction.

Grant J. Gruel, Thomas R. Behm, Gruel, Mills, Nims & Pylman, Grand Rapids, MI, John Augustine O'Brien, Fitzpatrick, Cella, Harper & Scinto, New York City, for plaintiff.

William L. Fette, Cornell, Dalzell, Fette, Ramey & Shek, Kalamazoo, MI, John Tramontine, Fish & Neave, New York City, for defendant.

### OPINION

ENSLEN, Chief Judge.

This matter is before the Court on various motions of plaintiff Donnelly Corporation and defendant Gentex Corporation for summary judgment and other relief. This action concerns charges that the defendant infringed as to three separate Donnelly patents (U.S.Patent nos. 4,646,210, 4,733,336, and 5,066,112).[1] For the reasons that follow, the Court grants the motions in part and denies the motions in part.

### I.

Plaintiff and defendant are both manufacturers of chromatic rearview mirrors used to reduce reflections from vehicle lights. They are also both manufacturers of specialized lighted rearview mirrors used in convertibles. The patents issues in this case concerning the first type of mirrors specifically concern electrochromic rearview mirrors—which darken reflections through use of an electrical system sealed within the mirror. In connection with such technology, Donnelly was issued U.S.Patent no. 5,066,112 (hereafter the " '112 patent") on November 19, 1991. According to the parties' expert witnesses, such patent was identical to prior Gentex electrochromic products with the exception of claims nos. 44–48 and 50–52 of the patent which assumed the additional element that the perimeter seal of the mirror assembly (which sealed the layers of the mirror) was

"dark in color such that it provides a dark permanent border around said assembly when viewed from said front facing surface of said first element." Deposition of Niall R. Lynam, at 101 (May 6, 1994); *see also* Deposition of George Platzer, at 86–87 (June 10, 1994).

More specifically, claim no. 44 provides in pertinent part that "said seal means being dark in color such that it provides a dark perimeter border around said assembly when viewed from said front facing surface of said first element." Claim no. 45 provides in pertinent part that "said conductive perimeter means being sufficiently narrow to be concealed behind said bezel/retaining rim when said assembly is viewed from said front facing surface of said first element." Claim no. 46 provides that the "assembly of claim 45 wherein said conductive perimeter means is selected from the group including a conductive frit, solder, a clip and a ribbon conductor." Claim 47 provides that "the assembly of claim 45 wherein said conductive perimeter means is a ribbon connector which extends along an edge of one of said first and second elements adjacent said peripheral edge thereof." Claim 48 provides in pertinent part that "said mirror assembly includes a mirror case including a bezel/retaining rim extending over the perimeter portion of said front facing surface of said first element; said bezel/retaining rim having a dark color matched to said dark color of said seal means." Claim 50, which describes the electro-optic mirror assembly, provides in pertinent part that "said seal means having a color matched and corresponding to said bezel/retaining rim such that said bezel/retaining rim and seal means appear as a perimeter border of uniform color around said assembly...." Claims 50 and 51 then describe the conductive means surrounding the optic medium and require that the means be concealed by the bezel.

In layman's terms, then, the distinguishing features of Donnelly's '112 patent are that the perimeter seal is colored black instead of off-white, that the bezel is thin, and that the

---

**1.** Plaintiff's complaint also concerned U.S.Patent no. 4,807,096. However, plaintiff has recently expressed its desire to abandon it claims as to the '096 patent. Accordingly, the Court dismisses those claims without prejudice pursuant to Federal Rule of Civil Procedure 41.

seal and electrical means are not apparent. According to one of the inventors, Richard Gahan, the purpose of this invention was to allow the creation of an electrochromic mirror with a thinner bezel. Deposition of Richard J. Gahan, at 52–53 (June 24, 1994). This was significant to the market since Donnelly's customers had previously requested mirrors with smaller rims. What Gahan and his co-workers discovered while working on this project (according to them) was that by color-matching the seal to the bezel (i.e. making it black) a smaller bezel was possible since there was no longer any need to hide the reflection from the off-white seal (i.e. the reflection of the black seal was imperceptible when color-matched). *Id.* The implementation of this change to Donnelly's product, as expected, had significant commercial success. Approximately 60,000 of these mirrors have been sold since they were first introduced in December 1989. Supplemental Affidavit of Niall R. Lynam, at ¶ 33 (Sept. 15, 1994). However, Gentex disputes whether such sales were due to the new appearance.

At the same time that Donnelly was developing this new product, the testimony and exhibits show that Gentex was at least considering and doing some testing on a black seal mirror. Declaration of Harlan J. Byker, ¶¶ 5–9 (June 14, 1994). However, the parties dispute as to whether Gentex had discovered the unique properties of the black seal mirror prior to Donnelly's invention being patented and sold on the market. *Id.* On the one hand, Gentex argues that its work on black seals was being used in prototypes as early as 1986 and that its development of this process through research headed by William Tonar lead to the sale and shipment of black seal mirrors in December 1990. On the other hand, Donnelly points to testimony to the effect that Gentex had essentially abandoned its research on the black seal in favor of mechanical solutions to the problem of a thin bezel until it viewed Donnelly's new mirror during a February 1990 trade show. Shortly thereafter, whether by coincidence or not, Gentex researchers began to build prototypes with black seals which lead to the development and sale of Gentex's black seal mirrors in December 1990.

As to the other patents—U.S.Patent no. 4,646,210 [2] (the " '210 patent") and no. 4,733,336 [3] (the " '336 patent")—Gentex's defense to Donnelly's infringement claims is that these patents (which concern basic rearview mirrors with light assemblies for convertibles) are invalid because of the on-sale bar under 35 U.S.C. § 102(b). This is to say that the patents are not legally enforceable because Donnelly sold or offered to sell products utilizing the patents more than one year prior to application date for the patent. In this case, plaintiff applied for the '210 patent on June 20, 1984 and for the '336 patent on June 26, 1986. These patents were embodied by Donnelly in rearview mirror light assemblies sold by Donnelly which became known as the LM1 and LM3 assemblies.

As to the '210 patent, the evidence is that by May 1983 Donnelly had already produced hundreds of sketches of the LM1.[4] Deposition of Brian Skogler, at 27 (September 15, 1995); Gentex Exhibit no. 139. In fact, at the time, Donnelly was working at developing the LM1 for use in the Ford Mustang convertible. By May and June of 1983, Donnelly artist Bill Gallmeyer had already completed "finished renderings" of the LM1 for Ford. Skogler Dep. at 27; Gentex Exhibits no. 137B and 138B. These first finished renderings of the assembly are substantially similar to the LM1 assembly later sold to

---

**2.** As to the '210 patent, Donnelly asserts infringement as to claims 1, 17, 24, 28 and 41 (all of which concern the lighting features of the mirror assembly).

**3.** As to the '336 patent, Donnelly asserts infringement as to claims 48–52 (all of which concern the lighting features of the mirror assembly).

**4.** It is clear from the evidence that the LM1 embodies the inventions included in the relevant claims of the '210 patent. *See* Donnelly's Supplemental Response to Interrogatory No. 8; Donnelly's Responses to Requests for Admissions No. 122, 125, 128, 131; Skogler Dep. at 312; Affidavit of John Tramontine (April 13, 1995). Even though there is some evidence of differences between early models of the LM1 and the '210 patent (and the same can be said of the '336 models), what is significant to note is that the patent claims in dispute are obvious in light of the models, drawings and parts prepared at the times of the offers in question.

Ford. Skogler Dep. at 31–32. In May of 1983, Donnelly's inventor of the '210 patent and market development and product design executive, Brian Skogler, conducted meetings with Ford executives to discuss sale of the '210 assembly. On May 13, 1983, such a meeting was conducted and Skogler recorded in his notes that Donnelly had "discussed with Ford" a ballpark price of $5 on a sketched assembly resembling the LM1. Skogler Dep. at 47; Gentex Exhibit no. 139. Skogler's notes of the meeting—which were prepared on May 16, 1983—reflect that during the meeting Skogler and other Donnelly personnel "kept assuring [David Jeshurun of Ford] that we would try and do [it] for $5." *See also* Gentex Exhibit no. 140.

Because of the speed of Ford's time line for the development, Skogler had no choice but to develop the assembly from such sketches. Skogler Dep. at 70. Also because of the speed needed for the project, Ford waived the initial inspection report for the assemblies. *See* Gentex Exhibit no. 139. This made eminent sense because—despite some concerns about whether the lights would emit too much heat—the invention was conceived of as a basic add-on to the existing mirror (and therefore did not need thorough testing). *See* Gentex Exhibit no. 137B. By June 1, 1983, Cars and Concepts, Inc.—a company employed by Ford to design the Mustang—had delivered to Ford a sample Mustang with a lighted review mirror model installed.[5] On June 28, 1983, Skogler directed his engineering department that another prototype be built. This prototype was not shown to Ford until July 20, 1983. However, on or about July 13, 1983 (just after the one year critical date), Ford issued a Car Program Direction Letter which officially approved the purchase of the LM1 for the Mustang convertible at the $5 price (and also demonstrated that most of Ford's agents had

approved the purchase around July 1, 1983). Gentex Exhibit nos. 142A, 186.

As to the '336 patent, which was embodied in the LM3 assembly,[6] such patent shows a change in design from the earlier LM1 assemblies. The patent envisioned using a basic modular/building block approach to permit a family of parts to be built from a common design. Gentex Exhibit no. 139. The LM3 was developed by Donnelly engineers with input from Guide Lamp (a GM division that wished to utilize this concept). Skogler Dep. at 144.

In the fall of 1984, Donnelly planned to sell enough of the LM3 assemblies to General Motors so as to put the total number sold at approximately 1 million. Skogler Dep. at 161. Thus, Donnelly salesman Robert Niemiec and William Lantz contacted General Motors to explore sales of the assembly in the fall of 1984. At that time, Niemiec began quoting Guide Lamp (a division of GM) a price of $8.00 per assembly. Guide Lamp in turn quoted Fisher (another GM division) a marked up price of $8.75 per assembly. Deposition of Robert Niemiec, at 91–92 (Nov. 4, 1994). Later, on December 11, 1984, Donnelly salespeople presented the LM3 to the GM Planning Work Group. The presentation featured many of the innovations contained in the '336 patent. Skogler Dep. at 164–165. It also included a page of cost data for the LM3 with a total price for the assembly of $8.75. According to Skogler, Lantz was trying to show at the presentation that GM could purchase a lighted mirror assembly for only $5.75 more than a basic mirror. Skogler Dep. at 169. Page 7 of the written presentation also asked GM for tooling information so that the LM3 could be released around April 15, 1985. Skogler Dep. at 170. Also attached to the presentation were sketches of an assembly substantially identi-

**5.** Although plaintiff disputes whether this mirror was similar to the LM1, the evidence from plaintiff's engineer, Brian Skogler, is that this was a lighted rearview mirror which was in probability the LM1 light and mirror assembly. Skogler Dep. at 81–83.

**6.** *See* Tramontine Affidavit at ¶ 8. The Court notes that plaintiff strongly objects to the use by defendant of an attorney's affidavit. The Court,

however, will excuse this irregular practice in this case because the plaintiff would not allow the defendant to have an expert examine pertinent documents. Also, the Court notes that many of the conclusions drawn by the affiant are simply comparisons of documents, and, therefore, their credibility depends not so much on the affiant's credibility as on the reliability of those documents.

cal to the LM3 assembly. Niemiec Dep. at 119–120.

This meeting was then followed by sales contacts with Corvette. On February 7, 1985, Lantz sent a letter to David McClellan of Corvette offering the new assembly for use in the 1987 model year. Lantz sent a second letter on February 21, 1985 offering the LM3 to Corvette at $9.00 per unit. Gentex Exhibit no. 38; Niemiec Dep. at 127–130. According to Skogler, Corvette was interested in the light because it wished to solve inexpensively a unique lighting problem for their front seats. Skogler Dep. at 176–177. By March 1985, Donnelly had produced a clay model of the LM3 assembly for review by McClellan. McClellan reviewed the model before March 12, 1985. At that time, he decided to choose Donnelly's LM4 assembly instead because of its rectangular shape. Skogler Dep. at 198–202.

Aside from the efforts with Corvette, Donnelly attempted to sell the LM3 to GM in the spring of 1985. In April of that year, Lantz sent a promotional letter to GM presenting the LM3 and its projected cost (together with a photograph of the LM3 assembly).[7] Gentex Exhibit nos. 204, 205 & 207. The purpose of the letter was simply to sell the assemblies to GM at the projected cost. Skogler Dep. at 221, 231. In fact, Donnelly's management does not dispute that Lantz was attempting to sell the LM3 to Oldsmobile by at least April 23, 1985. Skogler Dep. at 232. As a result, by May 8, 1985, GM had decided to use Donnelly's LM3 assembly for the 1988 Pontiac/Oldsmobile and 1989 GM–10 Chevrolet programs. Gentex Exhibit no. 210.

## II.

Since these motions are made under Rule 56, they concern the standards for summary judgment under that Rule. Summary judgment is appropriate only where no genuine issue of fact remains to be decided so that the moving party is entitled to judgment as a matter of law. *Barmag Barmer Maschinenfabrik AG v. Murata Machinery Ltd.*, 731

F.2d 831, 835 (Fed.Cir.1984). No genuine issue of material fact exists unless, in viewing the evidence in favor of the nonmoving party, a reasonable fact finder could return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). United States Supreme Court decisions encourage granting summary judgments where no genuine issue of material fact exists.

Furthermore, mere allegations are insufficient to create an issue of fact. There must be concrete evidence sufficient to create a genuine issue of material fact, otherwise summary judgment is appropriate. *See Union Carbide Corp. v. American Can Co.*, 724 F.2d 1567, 1571 (Fed.Cir.1984). When the evidence from the entire record could not lead a rational trier of fact to find for the non-moving party, no genuine issue of fact exists and summary judgment is appropriate. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

The party moving for summary judgment bears the initial responsibility of informing the court of the basis of its motion and identifying those portions of the record which demonstrate the absence of a material issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once this has been done, the nonmoving party must come forward with specific facts showing that there is a genuine issue of material fact on which the nonmoving party will bear the burden of proof at trial. Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 322–24, 106 S.Ct. at 2552–53. If after adequate discovery the party bearing the burden of proof fails to make a showing sufficient to establish an essential element of his claim, summary judgment is appropriate. *Id.* However, the courts must resolve all doubt respecting the presence of factual issues in favor of the one against whom summary judgment is sought. *Bell Communications Research Inc. v. Vitalink Communications Corp.*, 55 F.3d 615 (Fed.Cir.1995).

---

7. A hard model was also reviewed by GM design staff in April 1985. Skogler Dep. at 240–42. Also, according to the parties' witnesses, the "guts" or working parts of the LM3 were ready for use in March 1995. Skogler Dep. at 590. At that time, Donnelly only lacked approval for the appearance of the case, which came shortly thereafter. *Id.* at 592.

## III.

■ In this case, patent '112 is presumed valid. *See* 35 U.S.C. § 282. Thus, there is a presumption that the invention in question is novel, useful and nonobvious. This presumption applies not only to the patent as a whole, but to the various claims contained in the patent (including claims nos. 44–48 and 50–52, which are the subject of the litigation). *Bausch & Lomb, Inc. v. Barnes–Hind/Hydrocurve, Inc.*, 796 F.2d 443, 446–47 (Fed. Cir.1986). Therefore, the burden is on Gentex to prove that the patents issued are invalid by clear and convincing evidence. *Buildex Inc. v. Kason Industries, Inc.*, 849 F.2d 1461 (Fed.Cir.1988). "Clear and convincing evidence" is such evidence which produces in the mind of the trier of fact an abiding conviction that the truth of the factual contentions are "highly probable." *Price v. Symsek*, 988 F.2d 1187, 1191 (Fed.Cir. 1993).

■ Gentex contends as to patent '112 that this invention could not result in a valid patent because every element of the patent was either anticipated by prior art or was obvious. This claim relates in part to the nonobvious requirement which is contained in Title 35 United States Section 103, namely:

A patent may not be obtained ... if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

Whether the invention is obvious or not is a question of law depending on the factual circumstances of the case. *Constant v. Advanced Micro–Devices, Inc.*, 848 F.2d 1560, 1571 (Fed.Cir.1988). This question is to be answered only after considering several factors, i.e.:

(1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the pertinent art; and (4) secondary considerations, if any, of nonobviousness. Secondary considerations include objective indicia of nonobviousness such as commercial success, long-felt but unsolved need, and failure of others.

*Uniroyal, Inc. v. Rudkin–Wiley Corp.*, 837 F.2d 1044, 1050 (Fed.Cir.1988); *see also Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 693–94, 15 L.Ed.2d 545 (1966). Furthermore, the Court must determine the nonobviousness of the invention *as a whole*. *Gillette Co. v. S.C. Johnson & Son, Inc.*, 919 F.2d 720, 724 (Fed.Cir.1990). Whether the differences between the invention and prior art are obvious is not the sole focus of the inquiry. Rather, the inquiry is whether the answer to the problem posed to the inventor which resulted in the invention should have been obvious to a skilled person acquainted with the prior art. *In re Newell*, 891 F.2d 899, 902 (Fed.Cir.1989). In addressing this question, the Court must also keep in mind the principle established by the Supreme Court in *Graham v. John Deere Co.*, 383 U.S. 1, 36, 86 S.Ct. 684, 703, 15 L.Ed.2d 545 (1966) (citation omitted), to " 'guard against slipping into use of hindsight' " ... and to "resist the temptation to read into the prior art the teachings of the invention in issue." *See also Uniroyal, Inc. v. Rudkin–Wiley Corp.*, 837 F.2d 1044, 1051 (Fed.Cir.1988).

■ In this case, there is no dispute that the prior art taught one how to develop an electrochromic mirror with a wide bezel. Also, there are prior art references pertaining to other products which show the use of a dark perimeter seal in liquid crystal displays.[8] However, these references do not fully dictate obviousness since such art was used in technology differing from that in rearview mirrors.[9] *See In re Oetiker*, 977

8. Namely, the Trcka patent, the Wiemer patent, the Terada patent, the Yasuda patent, the Texas Instrument patent and the Casio patent.

9. The Court notes that defendant has lately filed a supplemental brief on the issue of obviousness and anticipation in which he claims that the claims relating to the '112 patent were obvious in light of a liquid crystal rearview mirror previous-ly designed by C–D Marketing, Ltd. Defendant's claim is that the company manufactured five mirrors in 1983, allowed one of the inventors, Hugh Greenlee, to use the mirrors in his automobile, and then sold the mirrors to Fisher Body for testing. While it is possible that such use and sale qualify these mirrors as prior art under Sections 102 and 103, it is equally possible from

F.2d 1443 (Fed.Cir.1992); *In re Geiger,* 815 F.2d 686 (Fed.Cir.1987). The question is whether the use of a black color-matched seal was an obvious solution to the problem of creating a thinner bezel mirror. While the concept of color-matching *simpliciter* might seem obvious (*see Myerson v. Dentists' Supply Co.,* 159 F.2d 681 (2nd Cir.1947)), the question here is whether it should have been obvious to a maker of electrochromic mirrors that it could reduce its bezel-size by color-matching its seal so as to result in an imperceptible reflection. The evidence of Gentex's difficulty in developing a similar mirror as well as Donnelly's commercial success in selling the new mirror are evidence of nonobviousness.[10] In light of such evidence, as well as the evidence relating to the development of the invention and the differences between the prior art and the invention, the Court determines that there are material issues of fact as to the issue of obviousness which must be determined by the trier of fact.[11] Accordingly, the motion for summary judgment as to the invalidity of Patent '112 is denied.

### IV.

As to the '210 Patent and the '336 Patent, it is the defendant's burden to prove by clear and convincing evidence that the patents are invalid because of the on-sale bar (under 35 U.S.C. § 102). *KeyStone Retaining Wall Systems, Inc. v. Westrock, Inc.,* 997 F.2d 1444, 1451 (Fed.Cir.1993). This requires proof that:

"there was a definite sale or offer to sell more than one year before the application

for the subject patent, and that the subject matter of the sale or offer to sell fully anticipated the claimed invention or would have rendered the claimed invention obvious by its addition to the prior art."

*Envirotech Corp. v. Westech Engineering Inc.,* 904 F.2d 1571, 1574 (Fed.Cir.1990) (quoting *UMC Electronics Co. v. United States,* 816 F.2d 647, 656 (Fed.Cir.1987)). This determination must be made based upon the totality of the relevant circumstances. These circumstances include reference to the policies underlying the on-sale bar, which include:

[D]iscouraging removal of inventions from the public domain that the public reasonably has come to believe are freely available; favoring the prompt and widespread disclosure of inventions; allowing the inventor a reasonable amount of time following sales activity to determine the potential economic value of a patent; and prohibiting the inventor from commercially exploiting his invention beyond the statutorily prescribed time.

*Id.* Once a *prima facie* case of invalidity due to the on-sale bar is made out, the burden then shifts to the opposing party to counter that showing. *U.S. Environmental Products Inc. v. Westall,* 911 F.2d 713, 716 (Fed.Cir. 1990). However, the ultimate burden always remains on the party challenging the patent. *Id.*

In this case, plaintiff's arguments as to both patents are premised on the theory that the patent must have been reduced to practice and embodied in a physical product at the time of the offer or sale for the on-sale

---

the facts as alleged that these mirrors do not constitute prior art because the use and sale was purely experimental. *See Manville Sales Corp. v. Paramount Systems, Inc.,* 917 F.2d 544 (Fed.Cir. 1990); *see also* Robert L. Harmon, *Patents and the Federal Circuit,* § 3.4(c), pp. 82–86 (3rd ed. 1994). Also, because of the manner in which this alleged prior art was raised, plaintiff may need additional discovery to meet these arguments. Therefore, such alleged prior art cannot now result in relief under Federal Rule of Civil Procedure 56.

10. Also, to the extent to which the evidence shows copying, it is also strong evidence of nonobviousness. *Intel Corp. v. United States International Trade Comm'n,* 946 F.2d 821 (Fed.Cir.

1991); *Avia Group International, Inc. v. L.A. Gear California, Inc.,* 853 F.2d 1557 (Fed.Cir.1988).

11. Similarly, the Court determines that there are issues of fact as to whether the claims were anticipated by prior art (under 35 U.S.C. § 102), whether the invention was previously made by Gentex (under 35 U.S.C. § 102(g)), and if there was a prior invention whether it was abandoned. *See Hahn v. Wong,* 892 F.2d 1028, 1032 (Fed.Cir. 1989); *Lutzker v. Plet,* 843 F.2d 1364, 1366 (Fed. Cir.1988). Further, the Court determines that the patent claims are sufficiently specified in accordance with 35 U.S.C. Sec. 112. *See Hybritech Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367, 1385 (Fed.Cir.1986).

bar to apply. This position is mistaken as a matter of law. The Federal Circuit in *UMC Electronics Co. v. United States*, 816 F.2d 647, 656 (Fed.Cir.1987), squarely held that reduction to practice is not required to prove application of the on-sale bar. As that court said:

> In view of all of the above considerations, we conclude that reduction to practice of the claimed invention has not been and should not be made an absolute requirement of the on-sale bar....
>
> We do not reject "reduction to practice" as an important analytical tool in an on-sale analysis. A holding that there has or has not been a reduction to practice of the claimed invention before the critical date may well determine whether the claimed invention was in fact the subject of the sale or offer to sell or whether a sale was primarily for an experimental purpose.... All of the circumstances surrounding the sale or offer to sell, including the stage of development of the invention and the nature of the invention, must be considered and weighed against the policies underlying section 102(b).

*UMC*, 816 F.2d at 656 (citations omitted).

In light of the law as to on-sale bar, it appears clearly from the facts presented by the parties that both patents are invalid under Section 102. First, the '210 patent was clearly depicted in drawings made at the time of the $5 "ballpark quote" made by Donnelly to Ford. At the time, Donnelly had produced concrete models and price information related to the LM1 which embodied the patent. Although full testing of the product had not been done at that time, the testimony supports that this was not anticipated or needed since given the nature of this add-on product Donnelly could develop it without extensive research or testing. Finally, the acceptance of the offer by Ford shortly after the 1 year critical date shows that Ford understood the objective representations of Donnelly as an offer for sale of the device to be patented at the $5 price. Given these facts, and given the policy of the statute to encourage patentees to not delay in applying for letters patent, the Court determines that patent '210 is invalid under 35 U.S.C.

§ 102(b), and that the defendant's motion for summary judgment under Rule 56 relating to such patent should be granted.

Second, as to the '336 patent, there is evidence of both clay and hard models of the patented product being in existence prior to the 1 year critical date. Further, the evidence shows that Donnelly's sales department had launched an aggressive marketing scheme to sell this product by April 1985, complete with photographs of the product. Prior to that Donnelly had completed figuring the price and tooling information relating to the product. This was possible because the LM3 mirror—like the LM1 mirror—was not a complicated invention that required long experimentation or research prior to its sale. It is also clear from the evidence that Donnelly's letters to Corvette and GM in the Spring of 1985 constituted offers to sell the LM3 assemblies. At the time, the LM3 assemblies were sufficiently embodied in parts and models so as make clear that the product to be sold was a version of the forthcoming '336 patent. Given these facts, and the policy of the statute of encouraging patentees to not unduly delay in seeking patents, the Court concludes that patent '336 is invalid under Title 35 United States Code Section 102(b), and that the motion for summary judgment under Rule 56 relating to such patent should be granted.

V.

Therefore, defendant Gentex's motion for summary judgment of invalidity (as supplemented) relating to the '112 patent is denied; defendant Gentex's motion for summary judgment of invalidity as to the asserted claims of the '210 and '336 patents are granted. These holdings also resolve other pending motions of the parties. Accordingly, plaintiff's motions for partial summary judgment as to the '210 patent, for partial summary judgment as to the '336 patent, and for partial summary judgment under 35 U.S.C. Sec. 102(g) are denied.